AMERICAN FURNITURE COMPANY, Appellant, vs. I. B. of T. C. and H. of A., CHAUFFEURS, TEAMSTERS, and HELPERS GENERAL LOCAL No. 200 OF MILWAUKEE and others, Respondents.

*April 28—September 15, 1936.*

*Eugene Wengert,* attorney, and *Walter H. Bender* of counsel, both of Milwaukee, for the appellant.

For the respondents there were briefs by *Joseph A. Padway,* and oral argument by *Mr. Padway* and *Nora B. Padway,* both of Milwaukee.

The following opinion was filed June 29, 1936:

WICKHEM, J. The facts in this case are not in dispute, and the questions presented are two: (1) Upon the facts presented, was there a labor dispute as defined in sub. (3) of sec. 103.62, Stats., so as to bring the activities of defendants within the protection of the Wisconsin labor code and render lawful picketing of plaintiff's store by defendants. (2) If so construed, is the labor code to that extent unconstitutional, (1) as denying due process and equal protection of the laws as guaranteed by the Fourteenth amendment to the federal constitution, and (2) as invalidly limiting the jurisdiction of the circuit court in violation of secs. 1, 9, and 22, of art. I, and secs. 2 and 8, of art. VII, of the constitution of Wisconsin.

It now becomes convenient to state briefly the facts as set forth in the stipulation. (The findings of fact are printed in the margin.[1])

---

[1] 1. That the plaintiff is a corporation organized under the laws of Wisconsin and doing business at 1862 West Fond du Lac Avenue, in the City of Milwaukee, Wisconsin, and is engaged in the retail furniture business.

2. That the plaintiff employs seventeen (17) men among others who are members of the same craft, trade and occupation as the members of the defendant unions, and the nature of whose employment is such as to cause them to be affected by the controversy alleged in the complaint. None of those seventeen (17) employees at or since the commencement of this action belongs to or was a member of the defendant unions or either of them. Many of these employees have been employed by the plaintiff continuously for ten (10) years or more.

3. That the defendant unions, I. B. of T. C. and H. of A. Chauffeurs, Teamsters, and Helpers, General Local No. 200 of Milwaukee,

Plaintiff is a corporation engaged in the retail furniture business. Its employees include seventeen men who are Wisconsin, of which the defendant, William Nagorsne, is the secretary, and Joseph F. Scislowski, is the business agent, and the Furniture Sales and Servicemen's Union Local 1342, of which the defendant, Alex H. Kalbing, is president, and the defendant, Philip F. Koerner, is business agent, which unions are unincorporated.

4. That all of the defendants were not served with summons and orders to show cause, but that all of said defendants by stipulation in open court and by their attorney, Joseph A. Padway, have waived service of summons and complaint and appeared in this action.

5. That the defendant, Philip F. Koerner, called at the place of business of the plaintiff on or about July 15, 1935, and conferred with Louis Schuldes, president of the plaintiff company. The discussion concerned the request that the plaintiff corporation agree to execute certain contracts, concerning the labor relations of plaintiff's employees, which said agreements are hereinafter referred to, but were not actually presented at this conference. Louis Schuldes stated to the defendant, Philip F. Koerner, that he would take this matter up with the other officers of the plaintiff company, but that he did not feel disposed to surrender his company's rights to run its business by signing the proposed contracts. The defendant, Philip F. Koerner, said: "You can run your own business, but we will proceed to bring your men into our unions," and further states, "Unless the contracts are signed, the unions will picket the store of the plaintiff." At this time, however, no picketing ensued.

5a. It was understood by the parties, including plaintiff's employees that the request to sign the contracts was equivalent to a request that the employees affected join one or the other of the defendant unions, depending upon the class of service performed, and that the terms and provisions of the contracts were such as would, in the usual and normal course of events, result in the employees affected joining one or the other of said unions.

6. That the officers of the plaintiff corporation informed its employees affected by the proposed contracts of the demands made upon them by the defendant unions. The employees thereupon held a meeting and took a secret ballot on the question of whether they desired to join one of the defendant unions. The ballot was unanimously against joining either of the defendant unions. The employees then notified the president of the plaintiff corporation of the result of such ballot, and that the said men were without exception satisfied with their present positions, relations with their employer, wages, and other terms of employment.

7. That shortly thereafter the defendant, Philip F. Koerner, telephoned to D. R. Morgan, vice-president of the plaintiff corporation, for an appointment to meet with him. At the time of this appointment the defendant, Philip F. Koerner, appeared and with him Jacob Frederich, secretary of Milwaukee Federated Trades Council, a

workers in the crafts represented by defendant unions. None of the seventeen employees are members of the defendant

council consisting of many local labor bodies with which both of the defendant unions were then and still are affiliated, and also the defendant, William Nagorsne. They conferred with D. R. Morgan, who informed said Philip F. Koerner, Jacob Frederich and William Nagorsne how the men had voted. That at this meeting the said D. R. Morgan asked the defendants what they expected the plaintiff to do in view of the vote of said employees; that the said defendant, Philip F. Koerner, said: "Require said employees to join one of said unions, and if they refuse to do so, then the unions will furnish men to fill the places of such employees from members of the defendant unions or men who would join said unions or one of them." The defendants were advised that none of the employees of the plaintiff belong to defendant unions; that the plaintiff had no objection to the men belonging to a union; that the plaintiff was not opposed to unions, but that it did not feel that it was proper for it to bring pressure upon the employees to join any union, since that was a matter that should be left to the employees themselves to decide; and that if the defendant unions desired to endeavor to "line up" said employees to join the union and the employees were willing to do so, that was the business of the unions and of the men and not the business of the plaintiff. That at this conference between D. R. Morgan, Philip F. Koerner, Jacob Frederich and William Nagorsne, there was left with said D. R. Morgan certain proposed contracts. That these contracts are substantially identical and are for the term of six months with provisions for renewal for an additional six months. Under these contracts each union is designated for the term of the contract "as the bargaining agent in the matter of wages, hours and working conditions" of each of the respective groups of employees affected thereby. Further provisions in said contracts relate to the hours of work per day and week, holidays, classification and rates of pay, vacations, recognition of seniority in layoffs, temporary filling by employees of higher rated positions, and arbitration as to disputes arising as to the interpretation of the agreement by a board, two members of which are to be designated by the union. In addition the employer was to obligate itself not to persuade or attempt to persuade any employee covered by the terms of this contract not to join the union and to institute no lockout during the term of the contract. The unions agreed that there would be no strike or walkout.

8. That thereafter the defendants, Philip F. Koerner and William Nagorsne, together with Jacob Frederich, again called for an interview and met with Lawrence Stone, secretary-treasurer of the plaintiff company, and the said D. R. Morgan. That the defendants, Philip F. Koerner and William Nagorsne, with Jacob Frederich, expressed doubt whether the vote taken was the free expression of the employees. That thereupon Lawrence Stone stated that he would request said employees again to consider the question of joining the

unions.    Many of these employees have been employed by plaintiff continuously for ten or more years.    On July 15,

defendant unions and would give to the said Philip F. Koerner, William Nagorsne and Jacob Frederich the answer within a few days as to what position would be taken concerning the signing of the proposed contracts.    That the said Lawrence Stone again placed before the said employees the question of joining the union and told them that they were perfectly free to do as they desired in the matter, and that whatever course the said employees decided upon would be agreeable to the plaintiff company.    That said employees again unanimously decided not to join the union and expressed themselves as satisfied with their wages, labor conditions, and relations with their employer.    That thereupon at a further meeting the said Lawrence Stone advised the said Philip F. Koerner, William Nagorsne, and Jacob Frederich that the said employees again had decided unanimously against joining the unions, and that the plaintiff company would abide by the employees' decision not to join the unions.    That thereupon Philip F. Koerner, or one of the spokesmen in his presence and with his approval, stated to Lawrence Stone that in view of the plaintiff's refusal to sign said contracts, it would be necessary for them to notify the Milwaukee Federated Trades Council that the plaintiff company was unfair to organized labor.

9. That the plaintiff by reason of the foregoing facts and other transactions between the parties not detailed herein has made every reasonable effort to settle this controversy by negotiations.

10. That on September 3, 1935, the defendant unions commenced picketing at the store of the plaintiff company, which store is located on the northeast corner of Fond du Lac Avenue and North Nineteenth Street.    The store faces on West Fond du Lac Avenue, and the entrance is in the center of the building, the building having a frontage of one hundred twenty (120) feet on West Fond du Lac Avenue, and the sidewalk being approximately eight (8) feet wide. The pickets prior to and at all times since the commencement of this action walked in front of and passed the door, and paraded in front of and passed the entrance in the form of an ellipse, the line over which said ellipse passed extending a short distance beyond the entrance on each side thereof, so that customers necessarily pass through or close to said ellipse.    The pickets permitted the customers to walk through their lines freely and without molestation, except that as the customers walked through the lines, they were accosted by the pickets, the pickets saying: "Don't you know that there is a strike here?"    "This store is unfair to organized labor."    "Why don't you buy at another store fair to organized labor."    "Cancel your account at this store."    The pickets carried signs upon which appeared the legends: "This store is unfair to organized labor." "This store is unfair to Truck Drivers' Union 200."    During the daytime the defendants maintained, prior to and at all times since the

1935, defendant Koerner, business agent of defendant Furniture Sales and Servicemen's Union, Local 1342, communi-

commencement of this action, from two (2) to five (5) pickets patrolling back and forth on the sidewalk and in front of and past the entrance to plaintiff's store. The entrance is about ten (10) feet wide at the sidewalk and at the doorway it is seven (7) feet wide.

11. That the plaintiff's store is open in the evenings on Monday, Friday and Saturday of each week until 9 o'clock. At these times the number of pickets increased to from twelve (12) to twenty (20), except on one occasion when there were about fifty (50). The said pickets have not used physical violence or abusive language, and at no time has there been disorderly conduct or a menacing attitude on their part. Numerous persons, particularly women, have refrained from entering plaintiff's business because they disliked being accosted by said pickets, but instead have gone elsewhere to trade.

12. That the said employees of plaintiff have not designated at any time representatives of their own choosing to negotiate the terms and conditions of their employment, but the individuals have dealt directly with the management of the plaintiff as to terms and conditions of employment. That the evidence does not establish that plaintiff company has done anything to prevent the said employees from choosing representatives to represent them in bargaining collectively.

13. That the employer, the plaintiff in this action, has not exerted coercion upon the employees in the matter of the vote taken upon the question of whether they desired to join one or the other of defendant unions.

14. That there were at the time of the commencement of this action, and still are, over sixty (60) retail furniture stores in the city of Milwaukee, including department stores which have furniture departments. That of this number twelve (12) have signed contracts generally similar to the contracts referred to, and which twelve (12) stores constitute a substantial portion of the industry. That the purpose of the defendants in securing the said contracts is to increase the union organization in the industry, enlarge the membership, and strengthen the organization so as to secure better and improved terms and conditions of labor.

15. That the conduct of the defendants has brought about a substantial loss of patronage to plaintiff resulting in substantial financial and irreparable injury to plaintiff's property and business, and that such substantial financial and irreparable injury will continue.

16. That on or about ten (10) days after the picketing commenced, the defendants, Philip F. Koerner and William Nagorsne, reported to the Milwaukee Federated Trades Council that there was a labor dispute at the plaintiff's store and requested the members of the Federation, and the unions composing it, and the members of their families and friends, to refrain from patronizing the plaintiff's store. That in the October issue of Hosiery Workers, which is a publica-

cated to plaintiff a request that plaintiff execute certain contracts affecting the labor relations of plaintiff's employees in the crafts represented by the union. The proposed contracts involve the following agreements on the part of the employer:

(1) Recognition of the unions as bargaining agents in matters of wages, hours, and working conditions for the respective crafts; (2) the payment of a wage scale included in the agreement; (3) regulation of hours and holidays. Other details of the relationship, such as vacations with pay, the seniority rule with respect to layoffs, an agreement that the employer will not, during the term of the contract, attempt to persuade any employee not to join the union and other matters were covered by this proposed agreement. The president agreed to submit the matter to the directors, but expressed some doubt as to the disposition of the company to sign the contract, whereupon Koerner stated that unless the contracts were signed the unions would picket the store. The officers of plaintiff brought the demands of the union to the attention of the seventeen employees affected by the contracts. These employees thereupon took a secret ballot on

tion published by the union of hosiery workers, and which union is affiliated with the Milwaukee Federated Trades Council, there appeared a notice as follows: "Milwaukee Labor Notes. For the information of our members, the truck drivers and sales clerks are on strike against the American Household Company, Fond du Lac Avenue. The members are requested to refrain from dealing with this company."

17. That the defendant labor unions are unincorporated and are associations composed of individuals as members. That these associations and their members are financially unable to respond in damages in the event a judgment should be rendered against the defendants in a suit at law. That the plaintiff, in order to pursue its remedy at law for damages, would be compelled to institute and carry on a multiplicity of suits.

18. That the defendants propose to and will continue picketing the place of business of the plaintiff and will continue to urge the unions belonging to the Milwaukee Federated Trades Council, and their members and the families and friends of such members, to desist from patronizing the plaintiff.

the question whether they desired to join one of the defendant unions and unanimously voted against so joining. The result of the vote being communicated to the representatives of the union, Koerner insisted that plaintiff require the employees to join one of the unions, and upon their refusal, the unions would furnish men to fill their places from its members or from men who were willing to join unions. One of the officers of plaintiff then stated that plaintiff company had no objection to the men joining the union, but did not feel it proper to bring pressure upon the men to join since that was a matter which should be left to the employees to decide; that if the defendant unions desired to induce the employees to join and the men were willing to do so, there would be no objection on the part of the plaintiff. Several days thereafter, representatives of the union expressed doubt whether the vote previously taken was the free expression of the employees. As a result, the employees were requested to reconsider their answer, and representatives of the plaintiff told the employees that they were perfectly free to do as they desired, and that whatever course they took would be satisfactory to the company. The vote was again taken and resulted in a unanimous decision not to join the union, and in an expression of satisfaction with their services, labor conditions, and relations with their employer. Plaintiff elected to abide by the employees' decision and declined to sign the contracts. On September 3, 1935, picketing of plaintiff's store took place. The character of the picketing need not be discussed, since defendants have abandoned their motion to review, and plaintiff's appeal is based on a contention that, under the facts as presented, picketing in any form is not permitted by the code.

Upon these facts, the question is squarely presented whether there was a labor dispute involving plaintiff and defendants in view of the fact, (1) that no employee of plaintiff was a member of defendant unions; (2) that none

desired or was willing to become a member; (3) that the employees were wholly satisfied with the conditions of their employment; (4) that the employees opposed the execution of the contracts proposed for plaintiff's execution; (5) that plaintiff has been unwilling to coerce its employees to join the unions, and has throughout been willing to take such position in that respect as its employees desired.

Sec. 103.62 (3), Stats., reads as follows:

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, *or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee,* regardless of whether or not the disputants stand in the proximate relation of employer and employee."

The act of which this section is a part is substantially similar to the federal Norris-LaGuardia act (29 USCA, §§ 101 to 115). The italicized words in sec. 103.62 (3), Stats., are not contained in the Norris-LaGuardia act as finally enacted by congress, although this clause was in the act as originally introduced. Consideration must also be given to sec. 103.62 (1) and (2), which read as follows:

"When used in sections 103.51 to 103.63, and for the purposes of these sections:

"(1) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in a single industry, trade, craft, or occupation; or who are employees of one employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more

employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in subsection (3)) of 'Persons participating or interested' therein (as defined in subsection (2)).

"(2) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it and if he or it is engaged in the industry, trade, craft, or occupation in which such dispute occurs, or is a member, officer, or agent of any association of employers or employees engaged in such industry, trade, craft, or occupation."

Preliminary to a determination of the scope and meaning of the labor code, it is necessary to give some attention to precedent legislation and judicial decision. Prior to adoption of the code, the only legislation in Wisconsin dealing with injunction in connection with picketing activities was sec. 133.07, Stats., which was substantially equivalent to the Clayton act (38 Stat. at L. 730) covering the same general subject. See *A. J. Monday Co. v. Automobile, A. & V. Workers,* 171 Wis. 532, 177 N. W. 867, where this court characterized sec. 133.07 as an attempt to engraft upon the laws of this state certain provisions of the act of congress commonly known as the Clayton act.

Subsection 1 of the section provides that working people may organize and carry on labor unions for the promotion of their general interests as workers. Subsection 2 provides that no restraining order or injunction will be granted by any court of this state in any case between an employer and employees or between employers and employees, or between employees, or between persons employed and persons seeking employment involving and growing out of any dispute whatever concerning employment, unless necessary to prevent irreparable injury to property and for which there is no adequate remedy at law. Subsection 3 provides in substance that no such restraining order shall prohibit any person or persons, whether singly or in concert, from terminating the

relation of employment and ceasing to work or advising or persuading others by personal means to do so, or from peacefully persuading any person to work or to abstain from working or from ceasing to patronize or employ any party to such dispute and other enumerated actions. The only interpretation of sec. 133.07 by this court was in the *Monday Case, supra.* It was there held that a dispute over the maintenance of a closed shop was not within the protection of sec. 133.07. Since the section in question is so similar to the Clayton act, it is of some moment to consider the interpretation of the Clayton act by the United States supreme court.

The principal case is that of *Duplex Printing Press Co. v. Deering,* 254 U. S. 443, 41 Sup. Ct. 172, 178. This was a suit in equity to restrain defendants from maintaining a boycott. Complainant was a manufacturing concern employing, among others, some two hundred machinists. Defendants were the business agents of the machinists' union and the union itself. Plaintiff conducted an open shop without discrimination between union and nonunion men. None of the defendants was or ever had been an employee of complainant, nor had the plaintiff been in any relationship whatever with the defendant unions. The union called a strike in plaintiff's factory as a result of which about fourteen union machinists left complainant's employ. This, however, did not materially interfere with the operation of the factory. Defendants proceeded to warn customers that it would be better for them not to purchase or install presses made by complainant, and to threaten them with loss if they did so; to threaten sympathetic strikes in other trades; to threaten a trucking company with trouble if it hauled presses manufactured by plaintiff; to incite employees of the trucking company to strike in order to interfere with the hauling and installation of presses; to demand that the repair shop do no work on Duplex presses; and to threaten union men with loss of union standing if they participated in the installation of such presses.

The lower court was of the opinion that these acts constituted an interference with interstate commerce subject to being enjoined unless the Clayton act forbade this injunction. The principal question upon appeal was whether under section 20 of the Clayton act, which is substantially sub. (2), of sec. 133.07, Stats., there was such authorization of defendant's conduct as to require the conclusion that no injunction should issue. It was held that all of the provisions of section 20 are subject to a general qualification respecting the nature of the controversy and the parties affected. It was held that the restriction upon the use of the injunction was in favor only of those concerned as parties to such a dispute as the act describes. The court repudiated the conclusion of the circuit court of appeals that the words "employers" and "employees" refer to the business class or clan to which the parties litigant belong, thus bringing within the operation of section 20 a dispute between the machinists' union or its members and the plaintiff, although these members stand in no relation to plaintiff. "Congress had in mind particular industrial controversies, not a general class war. 'Terms or conditions of employment' are the only grounds of dispute recognized as adequate to bring into play the exemptions. . . ." It was held that the action could not be regarded as bringing in all members of the labor union as parties to a dispute which proximately affected only a few of them.

The dissenting view was expressed by Mr. Justice BRANDEIS, who was of the opinion that defendants had a common interest threatened by plaintiff, and that it was legitimate for the union to refuse to handle materials, the production of which would weaken the standing and efficiency of the union in protecting the interest of its members. He expressed the opinion that the act as a whole gave no evidence of being restricted to legal relations between a specific employer and his employees, and asserted that the majority opinion proved too much because it would auto-

matically withdraw from the protection of the act the striker who by his very act of striking terminated his employment.

In the case of *American Steel Foundries v. Tri-City Central Trades Council,* 257 U. S. 184, 42 Sup. Ct. 72, which followed the *Duplex Case, supra,* the facts were as follows:

Plaintiff was a corporation operating a factory for the manufacture of steel products. It sought to enjoin the Tri-City Central Trades Council and fourteen individual defendants, some of whom were officers of the council, from conspiring to prevent plaintiff from obtaining and retaining skilled laborers in its plant. It was charged that the conspiracy was executed by organized picketing accompanied by threats, intimidation, and violence, against persons employed or seeking employment with plaintiff. Defendants admitted picketing for the purpose of notifying persons entering the plant that a strike was called because of reduction of wages and to persuade such persons not to replace striking workmen. Defendant denied threats or violence or responsibility for any such activities. An injunction issued enjoining defendants from in any manner by use of persuasion, threats, personal injury, intimidation, from hindering, stopping, obstructing any person in the employ of the complainant and from picketing or maintaining at or near the premises of complainant or on the streets leading to these premises any picket or pickets. The Tri-City Council was a labor organization consisting of representatives of thirty-seven trade unions in three cities. In 1914, plaintiff, which ordinarily employed sixteen hundred men, and whose plant had been closed for some six months, opened operations with three hundred fifty regular men, one hundred fifty being skilled workmen. The men employed on the reopening of the plant were offered a lower wage. The Tri-City Council sought to intervene and to negotiate for a restoration of the wage, but were informed that plaintiff was running an open shop and did not propose to recognize or deal with labor unions. On April 22d, the council declared a

strike, displayed a sign outside the entrance announcing the strike, and called on union men to stay away from the works. Only two men acted on the order to strike, one a member of the machinists' union and one who was not a union member. After discussing the evidence, the court states that it is clear that violent methods were so pursued as to characterize the attitude of the picketers as continuously threatening, and that it had the effect of putting employees and would-be employees in such fear that many abandoned work. The question was whether section 20 of the Clayton act was applicable. It was held, following the *Duplex Case,* that section 20 applied only to cases growing out of a dispute between the employer and employee concerning terms or conditions of employment. Only two of the defendants (the two who responded to the strike order) were employees qualified to invoke section 20. As to them, the court considered how far under section 20 their conduct might go without constituting a violation of the rights of those whom they would influence. It was the view of the court that picketing must not be done under circumstances which constitute intimidation or by numbers that produce such a result, and that the acts of defendant employees were not within the protection of section 20. The decree was modified as to them, however, by striking the restraint against "persuasion."

The next question was thus stated: Is interference of a labor organization by persuasion and appeal to induce a strike against low wages without lawful excuse and malicious when its members are in the employ or have been in the employ of the employer involved? The court held that this must receive a negative answer under the Clayton act. It was recognized that to make labor organization effective employees must make their combination extend beyond one shop, for the reason that the conditions in one shop are bound to affect the standards and wages in other shops at least in the neighborhood. It was considered that unions may use all lawful

propaganda to enlarge their membership, especially among those whose labor at lower wages will injure the entire guild. The *Hitchman Case* (*Hitchman Coal & Coke Co. v. Mitchell*), 245 U. S. 229, 38 Sup. Ct. 65, is distinguished on the grounds that there the purpose to induce a breach of contract was not lawful and that here it is. The *Duplex Case, supra,* is distinguished because that dealt with a secondary boycott on the part of persons having nothing to do with the machinists' union. Since the acts with which defendants were charged involved no secondary boycott, and since there was in fact a dispute between an employer and a labor union, many of whose members were employees and many more of whose members had been employees and might reasonably be expected to be re-employed, the court held that the injunction should be modified by deleting the restraint against persuasion.

The *Tri-City Case* followed the *Duplex Case* in holding that section 20 had application only to the two members of the union who at that time happened to be employed by the plaintiff. However, the opinion recognizes that employees must make their combination extend beyond one shop in order to avoid the general lowering of the standards in other shops, and that they may engage in lawful propaganda to this end and also, with certain limitations, in peacefully persuading employees to leave an employer. While the *Duplex Case* holds that a labor union, none of whose members are working for a particular employer, has no right to adopt coercive measures for the purpose of unionization, the *Tri-City Case* holds that if a union has members working for the particular employer, it may employ, under the protection of the Clayton act, peaceful persuasion, at least for the purpose of improving wages and working conditions. There appears to be no doubt that the limited effect given to the Clayton act by these decisions aroused the dissatisfaction of labor and brought the attention of congress to the subject, resulting in the en-

actment of the Norris-LaGuardia act. The house committee report on the Norris-LaGuardia act refers to the *Duplex* and *Tri-City Cases* and recites the fact that the act was construed to restrict the use of injunctions in favor only of the immediate disputants "and that other members of the union not standing in the proximate relation of employer and employee could be enjoined." With respect to section 13 of the Norris-LaGuardia act, containing a definition of a labor dispute, the report states that this section contains "a definition of a person participating in a labor dispute which is broad enough to include others than the immediate disputants and thereby corrects the law as announced in the case of *Duplex Printing Press Co. v. Deering*," *supra*, which is said to have held that section 20 of the Clayton act "only related to those occupying the position of employer or employee and no others." The report quotes Mr. Chief Justice TAFT's statement in the *Tri-City Case*, as to the necessity for labor organizations to enter labor disputes for the purpose of protecting general standards of working conditions. It concludes that since labor has the right to combine for the purpose of securing increased wages or better conditions of labor, and since the strike is a lawful instrument in the struggle between employer and employee, it would be hypocrisy to concede these rights and then to prohibit any effective exercise of them by labor. The primary purpose of the legislation is said to be to protect, first, the right of free association, and, second, the right to advance the lawful object of association.

It is contended by plaintiff that both the language of the Norris-LaGuardia act and the committee reports respecting it indicate a purpose merely to avoid the unduly restrictive interpretation given to the Clayton act by the *Duplex Case* and other cases and to confer upon workmen the right of effective association referred to by Chief Justice TAFT in the *Tri-City Case;* that decisions following the Norris-LaGuardia act have so construed the act, notably *United Electric Coal*

*Companies v. Rice* (C. C. A.), 80 Fed. (2d) 1, and *Lauf v. E. G. Shinner & Co.* (C. C. A.) 82 Fed. (2d) 68. The latter case construed and applied the provisions of the Wisconsin labor code, which it held to be not materially different from those of the Norris-LaGuardia act.

Specifically, it is the contention of plaintiff that the Norris-LaGuardia act and the Wisconsin labor code enlarge the immunities conferred by the Clayton act and its Wisconsin equivalent so as to enable employees engaged in a dispute with their employer to receive the aid of others in the same craft or industry, but that both these acts, like the Clayton act, depend for their application in every instance upon the existence of a basic employee-employer dispute. It is claimed that the text of the act supports this view. This claim necessitates an examination of the language of subs. (1) and (3), of sec. 103.62, Stats.

With respect to sub. (3), it is contended that the words "regardless of whether or not disputants stand in the proximate relation of employer and employee," were inserted merely to repudiate the doctrine of the *Duplex Case* which made the Clayton act available only to the actual employees, and to repudiate the rule that other members of a union not standing in the proximate relation of employer and employee could be enjoined from interference in the dispute. This view was taken by the circuit court of appeals for the Seventh circuit in the *United Electric Coal Companies* and *Lauf Cases, supra.* In the first of these, *United Electric Coal Companies v. Rice, supra,* plaintiff operated a mine. It had a contract with the United Mine Workers of America, and this contract called for the employment of members of this union. A rival union sought to oust the United and demanded recognition as the union with which plaintiff must deal. There was no dispute in the plant as to wages or working conditions. This court held that the Norris-LaGuardia act did not apply to give the Progressive union any standing

as a disputant. It held that there must be a dispute between the employer and employee growing directly out of their relationship; that the act does not apply to disputes between employees, or to disputes between employee unions to which the employer is not a real party. It held that there was no controversy between the plaintiff and the Progressive union on any subject. The plaintiff's men could join any union they wished.

In *Lauf v. E. G. Shinner & Co.* (C. C. A.) 82 Fed. (2d) 68, the question involved was the right of a union to picket the plaintiff's market in Milwaukee. In that case there was no dispute between the employer and employees, and the labor union did not represent any of the employees of the plaintiff. It was held that no labor dispute existed within the meaning of the Wisconsin or Norris-LaGuardia acts; that the Wisconsin act is not materially different from the Norris-LaGuardia act; and that on the authority of the *United Electric Coal Companies Case* there must be a labor dispute between the employer and employee before outsiders may participate. Some weight is also given to the fact that under the Wisconsin and federal acts any coercion of its employees by plaintiff would be a violation of the act.

In spite of the authority of these cases, it is our view that the language of the labor code is plain and unambiguous and does not exact as a prerequisite to a labor dispute that there be a controversy between an employer and his employees. Sub. (3) of sec. 103.62, Stats., makes the scope of a controversy broad enough to include questions relating to association or representation of persons relative to conditions of employment or industrial relations, and this regardless of whether or not the disputants stand in the proximate relation of employer and employee. While an able argument is made to the effect that this last clause was merely intended to permit a labor union to come to the aid of members or at the most workmen who are engaged in a labor dispute, this con-

struction cannot be sustained. It is the disputants who need not stand in the relation of employer and employee. Plaintiff's contention implies that basically the disputants must be the employer and the employee, whereas the act plainly indicates that the disputants, that is to say, the principals to a labor dispute, need not stand in the relation of employer and employee. This is further fortified by sub. (1) which provides as follows:

"(1) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in a single industry, trade, craft, or occupation; or who are employees of one employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in subsection (3) ) of 'persons participating or interested' therein (as defined in subsection (2) )."

This language is extremely broad and we find it impossible to escape the conclusion that labor unions have standing as disputants, provided the subject matter of the dispute comes within the definitions as set forth in sub. (3), and this in spite of the fact, (1) that there is no dispute between the employer involved and his employees; (2) that no members of the union are employed by the employer in question; and (3) that the only dispute relates to the unionization of the plant. Apart from the language of the act, we cannot believe, in the light of the history of this legislation, that either the Norris-LaGuardia act or the Wisconsin labor code was ever designed to have the limited effect contended for by plaintiff. Only a strained construction of the house com-

mittee reports and the text of the statutes can give color to such an argument.

One of the committee consultants when the Norris-LaGuardia act was under consideration in congress was Professor Frankfurter of the Harvard Law School. In his text on the subject of "The Labor Injunction" it is said, after reciting the problem with which the Norris-LaGuardia act deals: "How far a union in one craft may use its power to achieve the unionization of nonunion plants within the same craft. . . ." He states that section 9 of the proposed bill settles all of these questions so far as application for equitable relief is concerned. "Immunity from injunctions extends to all the categories we have described, save alone as to persons who are not engaged in the same industry with the complainant. . . . The interpretation given to the Clayton act by the *Duplex Case,* to the effect that the privileges of that act may be invoked only in a dispute between an employer and his employees, is thus rendered innocuous. . . ."

It is plain to us that the proponents of the Norris-LaGuardia act intended to enact into law the views thus expressed in *Exchange Bakery & Restaurant, Inc., v. Rifkin,* 245 N. Y. 260, 157 N. E. 130, 132:

"The purpose of a labor union to improve the conditions under which its members do their work; to increase their wages; to assist them in other ways may justify what would otherwise be a wrong. So would an effort to increase its numbers and to unionize an entire trade or business. It may be as interested in the wages of those not members, or in the conditions under which they work as in its own members because of the influence of one upon the other. All engaged in a trade are affected by the prevailing rate of wages. All, by the principle of collective bargaining. Economic organization today is not based on the single shop. Unions believe that wages may be increased, collective bargaining maintained only if union conditions prevail, not in some single factory but generally. That they may prevail it may call a strike and

picket the premises of an employer with the intent of inducing him to employ only union labor. And it may adopt either method separately. Picketing without a strike is no more unlawful than a strike without picketing. Both are based upon a lawful purpose. Resulting injury is incidental and must be endured."

This seems to have been the view of the court in *Levering & Garrigues Co. v. Morrin* (C. C. A.), 71 Fed. (2d) 284. See also *Miller Parlor Furniture Co. v. Furniture W. I. Union* (D. C. N. J.), 8 Fed. Supp. 209; *Cinderella Theater Co. v. Sign Writers' Local Union* (D. C.), 6 Fed. Supp. 164; 36 Columbia Law Rev. 157.

We consider that the language of this act clearly accomplishes that result. The addition to the Wisconsin labor code heretofore indicated by italics which extends the scope of labor disputes to controversies concerning employment relations or any other controversy arising out of the respective interests of employer and employee makes it even clearer that such was the intention of the legislature in enacting this subsection.

That the act as so construed is unconstitutional is the next assertion made by the plaintiff. The first contention is that the act is invalid under the Fourteenth amendment because it authorizes an unwarranted and unreasonable interference with the right of plaintiff to carry on its business and that of its employees to bargain collectively, that it denies plaintiff equal protection of the laws, and that it is not a legitimate exercise of the police power. Plaintiff's principal reliance is upon the case of *Truax v. Corrigan*, 257 U. S. 312, 42 Sup. Ct. 124, 128.

In the *Truax Case* plaintiffs owned a restaurant in the city of Bisby, Arizona. The defendants were cooks and waiters formerly in plaintiffs' employ and the labor union and trades' assembly of which they were members. In April, 1916, a dispute arose between plaintiffs and the union concerning

terms and conditions of employment of members of the union employed by plaintiffs. Plaintiffs refused the demands of the union, and it ordered a strike of its members who were in plaintiffs' employ. Thereafter, defendants entered into a conspiracy and boycott to enforce the demands of the union. The method included picketing, displaying banners advertising the strike, denouncing plaintiffs as unfair to the union, circulation of handbills containing abusive and libelous charges against plaintiffs and intimations of injury to future patrons. The state of Arizona had a statute with provisions substantially similar to those of the Clayton act. It was argued that if these provisions made defendants' acts lawful, plaintiffs' rights under the Fourteenth amendment were violated and the law void. The state courts dismissed the complaint. The state supreme court took the position that the gist of plaintiffs' charge was that defendants were merely inducing patrons to cease patronage by making public the fact of the dispute and the attitude of plaintiffs in it; that no man has a fixed property right in the esteem of the public; that while plaintiffs had a right to refuse the demands of the union, the union had a right to advertise the cause of the strike; that picketing, if peacefully carried out for a lawful purpose, was not a violation of plaintiffs' rights under the Arizona statute; and that while picketing was unlawful in Arizona prior to this act, plaintiffs had no vested right to have such a rule continue in that state. The supreme court of the United States held that under the statute as thus construed, picketing may be exercised in any form without invading plaintiffs' rights, providing violence is not employed. The court describes the method of picketing by defendants as follows: (1) Having agents of the union walk back and forth constantly during business hours displaying a banner announcing that the restaurant was unfair to cooks, waiters, and their union; (2) having these agents attend at or near the entrance to the restaurant and announce the same matters

in a loud tone of voice; (3) characterizing employees of plaintiffs as scab Mexican labor, and applying opprobrious epithets to them in handbills circulated to would-be customers in front of the restaurant; (4) including in such handbills abusive and libelous attacks upon the senior member of plaintiffs' firm; (5) seeking to disparage food, service, and prices, and general conduct of plaintiffs' restaurant; (6) attacking the character of those who would patronize the restaurant; and (7) threatening those who disregarded the urging of the pickets and actually patronized plaintiffs' restaurant. The court states the real question to be whether the means used were legal and concludes that they were not and that the defendants' acts constituted palpable wrongs. The court states:

"It was not lawful persuasion or inducing. It was not a mere appeal to the sympathetic aid of would-be customers by a simple statement of the fact of the strike and a request to withhold patronage. . . . It was moral coercion by illegal annoyance and obstruction and it thus was plainly a conspiracy."

It was held that an act which operates to make lawful such a wrong deprives the owner of the business of property without due process and is void under the Fourteenth amendment. In reply to the contention that this was a proper exercise of the police power and that property rights must yield to such power reasonably exercised, the court says:

"The broad distinction between one's right to protection against a direct injury to one's fundamental property right by another who has no special relation to him, and one's liability to another with whom he establishes a voluntary relation under a statute is manifest upon its statement."

It is pointed out that this is not a mere case of a peaceful secondary boycott as to the illegality of which courts have differed. Here the illegality of the means was without doubt and fundamental. The means used were libelous and abusive

attacks on the plaintiffs' reputation, like attacks on their employees and customers, threats of such attacks on would-be customers, picketing and patrolling of the entrance to their place of business, and the consequent obstruction of free access thereto—all with the purpose of depriving the plaintiffs of their business. To permit these definitely illegal acts and to decline to give a remedy effective against them would be to deny and disregard fundamental rights of liberty and property. Under the constitution of Arizona the plaintiffs would have had the right to an injunction. If defendants' acts had been done as the result of any other controversy than a labor dispute, an injunction would necessarily have issued.' To deny it in this case would be to deny equal protection of the laws.

It seems to us that this case is not applicable to the present situation. As we read the case, it is held that with respect to acts constituting libel, slander, intimidation, threats, breaches of the peace, or threatened breaches of the peace, which are recognized as definitely illegal, statutory immunity from legal redress cannot validly be conferred upon labor unions, and the legislature must retain and give effect to all legal and equitable remedies created by the constitution for the enforcement of rights and the redress of wrongs. See 13 N. Y. U. L. Q. Rev. 92, at p. 96. It is not apparent to us, however, that the legislature may not recognize the peculiar status of labor organizations in labor disputes because of the self-interest of the union and its members and the assumed necessity for protective group action and confer an immunity with respect to acts involving none of these wrongful features whether they take the form of picketing or not. There is no substantial question of classification. To hold that there was would put into question the validity of both the Clayton act, the Norris-LaGuardia act, and the Wisconsin labor code, no matter how these acts were construed.

The question is whether the legislature may declare lawful acts on the part of workingmen or groups of them that in its judgment are necessary in order to give to labor an economic weapon which tends to balance the capacity for economic duress which past conditions have created in the employer. We discover no constitutional provision which denies this power to the legislature. The evils which may and do flow from the natural bargaining advantage held by the employer may be recognized as calling for legislative correction and conceivably may be met in a variety of ways. It has here been met by equalizing the bargaining power of labor and leaving the determination of wages and working conditions to the play of economic forces. We cannot say that the legislature may not validly permit acts on the part of labor organizations not intrinsically wrongful as involving violence, intimidation, or misrepresentation, the purpose of which is to give notoriety to the attitude of the employer in a labor dispute. That the philosophy underlying such immunities is that the worker should have some economic advantage to balance that theretofore held by the employer and arising out of the control of jobs, is not a sufficient reason for denial of the legislative power, or for the conclusion that the exercise of this power results in the impairment of the constitutional rights of the employer. If it is, then the act cannot be sustained on any construction. The presence of a few union members in plaintiff's employ or the existence of a dispute between plaintiff and its employees would not be a circumstance sufficient to validate immunities extended to those not in plaintiff's employment, if these immunities were intrinsically beyond the power of the legislature to confer. Assuming a dispute between employer and employee, the only justification for extending the provisions of the code to outside organizations is their general self-interest in procuring satisfactory working and bargaining conditions in the craft or industry represented, and this interest exists whether the em-

ployees are in dispute with their employers or not. We conclude that the act as we construe it does not deny to plaintiff due process or equal protection of the laws and is a valid exercise of legislative power so far as this objection is concerned. Whether such laws constitute a wise solution may, of course, be fairly put in question, but the forum for such a controversy is the legislature and not the courts. The question is irrelevant here, and we cannot resist the conclusion that one of the purposes of the labor code was to make it so and to substitute a legislative declaration of policy for the varying standards and views theretofore expressed in judicial opinions.

The next contention is that the Wisconsin labor code, if construed to deny injunctive relief in such a situation as was here presented, is violative of secs. 1, 9, and 22, of art. I, and secs. 2 and 8, of art. VII, of the constitution of Wisconsin. Sec. 2, art. VII, vests the judicial power in this state both in matters in law and equity in the supreme court, circuit courts, etc. Sec. 8, of art. VII, confers original jurisdiction upon certain courts and confers upon them the power to issue writs of injunction necessary to carry into effect their orders, judgments, and decrees. Sec. 9, art. I, provides that every person is entitled to a certain remedy in the laws for all injury or wrongs which he may have received in his person, property, or character. The act is claimed invalidly to limit the equitable powers of the circuit court. It is not necessary to discuss here the undoubted limitations upon the power of the legislature to diminish the jurisdiction of the circuit court. It is beyond question that the legislature may change the substantive law, and in doing so increase or reduce the subject matter upon which the jurisdiction of courts operate. It may enact a statute creating a crime or repeal such a statute. The first enactment does not increase nor does the latter diminish the jurisdiction of a court. It merely is an exercise of the power of the legislature to declare the public policy of

the state and punish offenses against its sovereignty. Unless there is some other constitutional objection, such laws would not be invalid as interferences with the jurisdiction of the courts. When the legislature makes peaceful picketing valid under certain prescribed circumstances it leaves nothing for an injunction to operate upon. The provisions of such a law are substantive in character. They may or may not be unconstitutional on some other ground, but it is certain they are not unconstitutional upon the ground assigned.

We conclude that defendant unions had standing under the act, although representing none of the members of their craft employed by plaintiff, and although there was no dispute between plaintiff and its employees, to be a disputant with plaintiff, and that unionization of plaintiff's store could constitute a proper subject for dispute. We further conclude that the act, so construed, is not repugnant to any constitutional provision.

We have deferred until this time discussion of a question that both briefs assume to be necessarily answered by the determination heretofore made, but which we are satisfied is separate and distinct. Plaintiff contends that for it to require its employees to name defendants as their bargaining agents would violate the right of the employees to be free from its coercion in such matters, and that any picketing of plaintiff, however peaceful, constitutes pressure upon it to compel the doing of an illegal act or at least one that is contrary to public policy. It seems to us that, even if this contention be sound, it does not militate against the propositions heretofore decided. Thus, it coming to the attention of a union that a particular employer, (1) is paying extremely low wages to workers in the craft it represents, or (2), is insisting upon unduly long hours of labor, or (3), is refusing to hire union labor or to permit members of a union to work for him, it could make demands for changes and, upon refusal of these demands, be considered a party to a labor dis-

pute and entitled to the exemptions of the act. On the other hand, regardless of its standing to become a disputant, the terms of the act cannot be stretched to permit a union to enforce by picketing demands which the employer may not lawfully accede to. It is plaintiff's position that this is in effect what defendants are permitted to do by the terms of the judgment; that the very act under which defendant claims its rights to picket prohibits coercion of the employees by the employer or any interference by him with the right of the employees freely to organize and select their agencies for collective bargaining. Defendants contend that the act evidences a purpose to foster organizations of employees and recognizes the helplessness of the individual employee; that to grant plaintiff's view is to outlaw all closed-shop agreements, and thus to restrict rather than to extend the rights of workmen and organized labor, contrary to the plainly evidenced intent of the act.

The question has given us much concern, and its solution is attended with very substantial difficulties. Plaintiff stands indifferent, willing to permit the union to persuade his men to join a union, willing to bargain with the union if it succeeds in winning the allegiance of the men, and, with its employees' consent, to sign contracts vesting in the union the right to represent the men. It declines, however, to coerce its employees in any respect. May it be subjected to picketing to compel it to insist, as a condition of continued employment, that its men consent to the designation of defendant unions as their bargaining agents?

If the above analysis is correct, the question is whether in this case defendants are seeking by such pressure as is involved in peaceful picketing to compel plaintiff to violate the rights of free association and collective bargaining which this court has held to be vested in the employees under sec. 103.51. *Trustees of Wis. S. F. of Labor v. Simplex S. M Co.* 215 Wis. 623, 256 N. W. 56.

Sec. 103.51, Stats., which is entitled "Public policy as to collective bargaining," reads as follows:

"In the interpretation and application of sections 103.51 to 103.63 the public policy of this state is declared as follows:

"Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workmen have full freedom of association, self-organization, and the designation of representatives of his own choosing, to negotiate the terms and conditions of his employment and that he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Plaintiff naturally lays much stress upon the requirement that a negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees, and that portion of the section which confers upon the individual workman full freedom of association and designation of representatives of his own choosing free from interference, restraint, or coercion by his employer. Defendants' contention is that this section was for the purpose, (1) of encouraging associations of workmen to conduct collective bargaining; (2) to insure that such associations would be free from the dominance or control by employers, to the end that workmen might be able to bring to bear in their negotiations with employers whatever weight or power results from collective or group effort. We are of the opinion that defendants' contention with respect to the general purpose of the act is sound. The futility of individual negotiation is

expressly recognized, and the purpose of the act is to encourage group negotiation as a substitute and to protect the latter activity from dominance or coercion by the employer.

There is nothing in the act to indicate that existing closed-shop agreements are intended to be invalidated or future agreements of this character prohibited unless such intention is to be implied from the requirement that employers practice no restraint or coercion upon the exercise by the employees of their right to associate and to name their bargaining agents. See 44 Yale Law Jour. 1067; 48 Harvard Law Rev. 656. On the other hand, it is plain that the act does not require the employees to adopt any specified form of organization or to affiliate with existing outside labor organizations. We are faced with the seeming contradiction that while the act contains no expressed intention to outlaw closed-shop agreements, it is expressly provided that activities of employees in the direction of association and organization for bargaining purposes shall not be subject to coercion or interference by employers. The conclusion that the latter was one of the principal purposes of this act as well as the Norris-LaGuardia act is indicated not merely by the text of the acts, but by the practical construction given substantially similar provisions of section 7a of the NRA by the National Labor Board. See 4 George Washington Law Rev. 433.

The question is not easy of solution. Defendants contend that the purpose of the act is merely to prevent dominance by an employer of the organization of his employees and that, so long as he exacts as a condition of continued employment membership in an outside union over which he has no control, the purposes of the act are promoted rather than defeated. While much may be said for this view, it is extremely difficult to reconcile with the full freedom of association and designation of representatives which the act expressly secures

to the men. It may well be that if, when negotiations for a closed shop are initiated between an outside labor union and an employer, the employees have already exercised, free from their employer's domination, or are in the process of so exercising their right to organize and to select representatives for collective bargaining, the employer may not insist that another or different plan of organization be adopted or that other representatives be chosen. If he may not, then no pressure may be brought to bear upon him by an outside union to compel such action. Whether pressure of the sort authorized by the act may be brought upon the employees by the outside union, it is unnecessary to determine, although in this connection it may be significant that neither the Wisconsin Labor Code nor the Norris-LaGuardia act contain any provisions expressly inhibiting labor organizations from exercising the coercion and domination prohibited to employers. See 47 Harvard Law Rev. 117; 21 Cornell Law Quarterly Rev. 640.

We do not find it necessary finally to determine the difficult questions above set forth. Assuming that defendants' contentions with respect to them be rejected and the rule most favorable to plaintiff established, the result in this case would not be affected.

The law plainly protects not the unorganized individuals constituting the employees, but the right of employees to act in groups or associations. It deals with the collective effort of employees to better their conditions, and it is only their activities in this direction that are brought within the protection of the statute. The rights of employees not to organize and not to name bargaining agents is neither fostered nor protected. Where the employees have neither organized and named their bargaining representatives nor taken any steps so to organize, we see nothing in the act which prohibits the employer selecting their bargaining agent by contract with a labor union which is not subject to his domination.

Such a step promotes rather than defeats the purpose of the code.

This is the situation presented by the facts in this case. The employees involved in the crafts represented by defendant unions were not organized, had taken no steps to organize, and did not desire so to do. The mere refusal by the employees to join defendants' unions or to assent to a contract making the unions their bargaining representatives did not constitute the exercise of steps leading to organization of the employees for bargaining purposes. What happened was that the men simply declined or neglected to organize or at least had taken no steps in that direction. In such a situation plaintiff could exercise the right that it always had, in the absence of statute, to establish whatever conditions for continued employment its judgment might dictate with the one exception that it could not insist upon a type of organization which preserved to it a position of dominance.

Thus, we conclude that such peaceful picketing as was authorized by the court in this case cannot be said to have had as its objective pressure upon the employer to do an unlawful act by interfering with the rights of his employees to carry on such measures of organization and collective bargaining as they might freely decide upon. While plaintiff might lawfully decline to enter into such a contract as defendants proposed, we think that when it did so it was in dispute with the union, and the latter might adopt such measures as are sanctioned by the labor code.

There being no motion to review, there is no occasion to comment on the character and extent of picketing permitted under the code further than to say that the activities of defendants permitted by the judgment do not include violence, intimidation, misrepresentation, or obstruction of access by customers and appear to be well within the range of lawful activities as defined by the code.

*By the Court.*—Judgment affirmed.

FAIRCHILD, J. (*dissenting*). The attack by the defendants is upon an employer who stands indifferent, so far as the acceptance or nonacceptance by plaintiff's employees of defendants' propositions is concerned, because of the statute, sec. 103.51, which declares that "Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees. . . . Therefore it is necessary that the individual workman have full freedom of association, self-organization, . . . and that he shall be free from the interference, restraint or coercion of employers of labor, . . . in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

While agreeing thoroughly in other respects with the interpretation accepted by the decision in this case, as to when a labor dispute exists and as to the immunities of labor and labor organizations during such disputes from the operation of the usual remedies of injunction, I am in doubt as to the right of an employer to interfere with the freedom of choice of a group of men to have a representative or to retain the right individually to negotiate with the employer, where this group of men have been in the service of the employer for many years. If, under the statute, in an organized business where men have established a status of employee, morally recognized, if not legally, the employer can force those men to organize or start them toward an organization, the control feature, described as employer domination, was not done away with as evidently the legislature intended it to be.

The holding with respect to the effort on the part of the defendants to persuade the plaintiff to discharge its employees unless they join some one of the defendant unions is a step contrary to the trend of legislation upon this subject. We are developing an industrial jurisprudence. Experience will point out inconveniences that may be remedied and dangers that may be avoided. Our legislature, guided by the

steps which have occurred in this evolution which has re-
sulted from adventure, failure, and success in application of
laws responsive to certain theories of economics, has for the
present provided those engaged in labor in industry with a
scope of freedom of action for their collective and individual
welfare supported by incidentals which are calculated to es-
tablish a more balanced freedom in the matter of contracting
as to hours of labor, wages, and working conditions. I do
not mean to be understood as stating that the following quo-
tation from respondents' reply brief is a full presentation of
respondents' position. I use the quotation, because it seems
to me to express fully the purpose of the freedom clauses in
the code: "We contend that the history of the labor code,
and the purposes of the preamble clearly show that the 'free-
dom' clauses were to assure the employees freedom from em-
ployer domination. Previous to the enactment the employer
had interfered with the affirmative action of employees de-
siring to unionize." Were this movement against "one or
more employees or associations of employees" by one or more
employees or associations of employees, we would have be-
fore us the parties really affected. It seems to me that the
dispute lies there, and that the defendants are seeking to com-
pel the plaintiff to act illegally by forcing it to join with them
against the other parties to the dispute. *Trustees of Wis.
S. F. of Labor v. Simplex S. M. Co.* 215 Wis. 623, 256
N. W. 56.

If the contest were distinctly traced and definitely limited,
at one end would be the employees who refuse to join the
union, and at the other the unions seeking to induce those
employees to become members. The result might be quite
similar to the existing condition, but as the real parties have
interests different from those of the employer, who is not
obstructing the efforts of the unions and is not interfering
with his employees in their choice of representative, the
approach of each interested party would be different. The

374

causes to be stated would be different. A different appeal to the public would result, and replies would accordingly be different. The issue should be stated truthfully, for dissemination of falsehood will be enjoined in labor disputes. *J. H. & S. Theatres v. Fay,* 260 N. Y. 315, 183 N. E. 509; *Nann v. Raimist,* 255 N. Y. 307, 174 N. E. 690; *Wilner v. Bless,* 243 N. Y. 544, 154 N. E. 598. In the conceded facts of this case, it appears that the plaintiff was told by a representative of the unions: "You can run your own business, but we will proceed to bring your men into our unions;" that the plaintiff was also told to require its employees to join one of said unions "and if they refuse to do so, then the unions will furnish men to fill the places of such employees from members of the defendant unions or men who would join said unions or one of them." It is not defendants' purpose to run or ruin plaintiff's business. It is their plan to have as members of their unions the men who work for plaintiff. It is stipulated by the parties that the plaintiff took the position that the company "had no objection to the men belonging to a union; that the plaintiff was not opposed to unions, but that it did not feel that it was proper for it to bring pressure upon the employees to join any union, since that was a matter that should be left to the employees themselves to decide; and that if the defendant unions desired to endeavor to 'line up' said employees to join the union, and the employees were willing to do so, that was the business of the unions and of the men and not the business of the plaintiff;" that after the statements just quoted, Mr. Stone, an officer of the plaintiff, asked the employees again to consider the question of joining the unions. He did so and told the men "that they were perfectly free to do as they desired in the matter, and that whatever course the said employees decided upon would be agreeable to the plaintiff company." It was further agreed that the employees thereafter unanimously decided not to join the unions.

It is my judgment that the legislature intended to prevent the employer from exercising any control either in the beginning, the middle, or the end of organization over the selection of a representative for the purpose of collective bargaining or other mutual aid or protection. I therefore am of the opinion that the decision in this case should be modified by giving due consideration to this effort to prevent employer domination in the matter of organization and choosing a representative as provided for in our own labor code.

FOWLER, J. (*dissenting*). I understand it to be conceded by the opinion of the court that unless the labor code referred to in the opinion has so extended the Clayton act as to include labor controversies other than those between employers and their employees the picketing involved should be enjoined. This follows because unless there be such extension the defendants have no right to picket or do any act whatever to the injury of plaintiff's business. In such case picketing will be enjoined whether otherwise unlawful or not merely because it inflicts injury without any lawful justification or excuse. The protective features of the Clayton act, and those of the labor code unless the code broadens the coverage of that act, against enjoining specified acts do not extend to any one but striking employees and those acting in aid of them in their attempts to better their conditions. As there is no complaint by employees, and no action by them against their employer, there is no justification under the Clayton act for any acts by anybody in aid of them, and no right to do anything whatever to the hurt of their employer. This follows from the principles stated in the *Duplex* and *Tri-City Cases*, cited in the opinion of the court. So, to justify the picketing involved under the labor code, it must appear that the code extends the provisions of the Clayton act to include controversies other than those between employers and their employees. In my opinion, the code has not so extended that act

as to include the instant controversy because it is not a controversy between employer and employees.

The provision of the labor code claimed by respondents to justify the picketing involved is sec. 103.62, Stats. Sub. (1) of that section makes it apply to cases involving or growing out of a "labor dispute." The act does not profess to apply to any other class of controversies and respondents do not contend that it applies to any other. Sub. (3) of the section defines a labor dispute as "any controversy concerning" several named things or "any *other* controversy arising out of the respective interests of employer and employee." The word "other" in the last clause of sub. (3) implies that the "controversies concerning" the several things mentioned must be between "employer and employee" or it is not a labor controversy within the terms of the act. There is no controversy between employer and employees in the instant case. Thus according to the plain words of the statute itself the statute does not cover such a controversy as is here involved.

It is to be noted that this view of the federal statute was taken by the United States circuit court of appeals for the Seventh circuit, in which this state lies, in *United Electric Coal Companies v. Rice* (C. C. A.), 80 Fed. (2d) 1, and *Lauf v. E. G. Shinner & Co.* (C. C. A.) 82 Fed. (2d) 68. It is further to be noted that a writ of *certiorari* to review that ruling was denied by the United States supreme court. *Rice v. United Electric Coal Companies*, 56 Sup. Ct. 590, 80 L. Ed. 1000. As far as the federal act is concerned, the rule of that case is binding upon this court. Maybe this court may construe its own statute differently. But it seems anomalous for this court to construe a statute of this state taken bodily from a federal statute different from the construction directly given it shortly after its enactment by the federal circuit court of appeals of this jurisdiction and inferentially given it by the supreme court of the United States.

I am not unmindful of the contention of respondents that when the bill that was enacted into the federal statute was before the congress of the United States, the view of the sponsors of the bill was that it would cover every sort of labor controversy. Nor am I unmindful of statements in the reports of committees of the houses of congress to the effect that it was intended to cover deficiencies in the Clayton act, and was conceived as covering labor disputes not within that act. Perhaps it was contemplated by the sponsors of the bill that it covered all sorts of labor disputes. Nevertheless, the bill was so framed as not to cover any controversies except those arising between employer and employee. It was intended to cover the point of outside labor organizations espousing the cause of employees when a controversy existed between them and their employer, and there is nothing in the act itself or in the statements in the committee reports to indicate that any controversy except such as arose primarily between employer and employee was in mind. The construction of the act urged by the respondents and upheld by this court would authorize any labor union in Milwaukee or elsewhere to picket every manufacturing plant and every retail mercantile establishment in the state that would not compel its employees against their wishes and when entirely satisfied with their wages and their conditions and hours of labor, to form and join a labor union, or join an existing labor union, or be discharged. I do not believe that the legislature or the congress intended or imagined that the bill would legalize such picketing.

The opinion of this court bases its conclusion that the instant case involves a labor dispute upon what I consider to be an erroneous view of sub. (1) of sec. 103.62, Stats., headed "Definitions." Clauses (1), (2), and (3) of said subsection cover the whole matter of the application of the labor code. To be within the code a case must be, (1) "between one or more employers or associations of employers

and one or more employees or associations of employees" (no employee or association of employees is a party to this case) ; or a case must be, (2) between "one or more employers or associations of employers and one or more employers or associations of employers" (this case is not between employers or an association of employers) ; or a case must be, (3) "between one or more employees or associations of employees and one or more employees or associations of employees" (there are no employees and there is no association of employees a party to this case) ; or the case must involve conflicting or competing interests between persons as defined by sub. (2) participating or interested in a "labor dispute" as defined by sub. (3). No such labor dispute as is defined in sub. (3) is involved in this case, because, as above pointed out, the word "other" in sub. (3) implies that the dispute must arise out of the "conflicting interests of employers and their employees," and there is no conflict between the employer and its employees in the instant case. Sec. 103.62, Stats., merely does three things. Sub. (1) defines the "classes of cases" to which the labor code applies. Sub. (2) defines the persons to whom the code applies. And sub. (3) defines the term "labor dispute." There is no other definition of a labor dispute in the act than that contained in sub. (3).

The case is not within the code for the further reason stated in the opinion in the *Rice Case, supra*. The term "labor dispute" "infers employment—implies the existence of the relation of employer and employee." "The dispute referred to in the statute must be one between the employer and employee or growing directly out of their relationship." 80 Fed. (2d) 5. The dispute here involved is not such a one. The ruling in the *Rice Case* was made although the phrase "or any other controversy arising out of the respective interests of employer and employee" does not occur in the federal labor code. The implication that the controversy involved must arise out of conflicting interests of employer and

employee is therefore stronger under the state than under the federal code.

If the acts of the defendants be considered as within the labor code, the picketing involved should nevertheless be enjoined. The decision of the court is based upon the propositions that the acts involved are lawful under that code, and that lawful acts will not be enjoined although they result in injury to another. But I take it as so plain as not to need citation of authority to support it that a person is entitled to injunctional relief against continuance of unlawful acts that will result in irreparable injury to him and that picketing will not be permitted to compel one to do an unlawful act. These two propositions are concededly correct by the statement in the opinion of the court that "the terms of the act [labor code] cannot be stretched to permit a union to enforce by picketing demands which the employer may not lawfully accede to." It is likewise plain that an act is unlawful that is contrary to the public policy of the state as disclosed by its statutes.

The labor code, by sec. 103.51, Stats., by its own terms declares the public policy of the state respecting labor controversies. It declares that "negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees;" and that "it is necessary that the individual workman have full freedom of association, self-organization, and the designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

An express purpose of the picketing involved by the terms of the contract the defendants demanded that the plaintiff sign is to compel the plaintiff employer to coerce its em-

ployees into accepting the representatives of a specified labor union "as the sole bargaining agent" of the employees, instead of allowing them "full freedom" in designating such representative. The statute cited by necessary implication prohibits the employer from interfering with, restraining, or coercing its employees in designating a bargaining agent of their own choice. By demanding that the plaintiff sign the agreement providing that it would recognize a bargaining representative not chosen by the plaintiff's employees but one chosen by the defendants, the defendants demanded that the plaintiff violate the statute cited. They demanded that the plaintiff do an unlawful act under threat of picketing its place of business. And the matter does not stop here. Under the stipulated facts the plaintiff was told that if it signed the agreement it should discharge its employees if they refused to form and join a labor union of the brotherhood with which the defendants are connected. It was told it should require its employees to join the unions with which the defendants are connected, and if they refused the defendants would furnish members of the unions to take their places or men who would join the unions. It is stated in one of defendants' briefs before us : "We do not hesitate to say that picketing is intended to injure the business of the employer," and that the purpose of the picketing is that "by losing trade the appellant may be induced to unionize his plant." The word "induce" is used instead of the word "coerce," but a spade is a spade, no matter what it may be called. Such acts of an employer were expressly declared unlawful because violative of the statute cited in *Trustees of Wis. S. F. of Labor v. Simplex S. M. Co.* 215 Wis. 623, 643, 256 N. W. 56. This view of the statute was expressly taken by the federal court of appeals of this circuit in the *Lauf Case, supra.* It is there stated, page 72 :

"It being unlawful for appellee to dictate to its employees what organization they should join, or what representative

they should select, . . . it follows that appellants' demand upon appellee was unlawful."

The opinion of the court herein attempts to evade the contention that the coercion of the plaintiff's employees involved is contrary to the declaration of the labor code by stating, in effect, that the inhibition of the statute goes only against influencing employees that are organized or in process of organizing. This to my mind is untenable. The language of the statute declaring the public policy of the code is directed to the protection of the "individual unorganized worker;" it declares that "he should be free to decline to associate with his fellows;" that "it is necessary that he have full freedom of association, of self-organization, and designation of representatives of his own choosing;" that "he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives." What is there in this language that warrants the interpretation that the inhibitions apply only to influencing employees that have combined into an organized entity or are moving to do so, or to indicate that it has no application to employees that have not so organized and are not so moving? The employees here involved, the employees that the defendants' picketing is aimed to coerce the plaintiff into coercing into joining the unions with which the defendants are connected, have twice expressed their individual wishes by their unanimous vote. They do not want to be represented in collective bargaining by the representative proposed by the defendants. They do not want to join the unions with which defendants are connected. "Full freedom of association and self-organization" implies freedom to join or not to join a specified union; it implies freedom to organize or not to organize into any union. A statute that attempted to prohibit employers from "interference, restraint or coercion" of employees organized into a union in choosing a bargaining agent and left them free to interfere, restrain, or coerce their

employees not so organized into accepting a bargaining agent would deny unorganized employees an equal footing before the law with organized employees. It is well known that the purpose of the inhibition against employers in the labor code was to prevent employers from influencing their employees to organize a "company union." It is no less obnoxious, it is no less violative of the expressed declaration of the labor code, to influence employees into joining a federated union, than it is to influence them into joining a company union. Both species of influence are prohibited to the employer by the code. Any statute that prohibited employers from attempting to influence its employees to join a company union but expressly authorized them to exert influence to coerce them into joining a federated union under threat of discharge if they refused to do so would have small chance of passage by any legislature and equally small chance of standing up before the law. A thing that cannot be done directly, cannot be done by indirection.

If either of the propositions be correct, that the instant case is not within the labor code or that the act required by the defendants of the plaintiff is unlawful, there is no need for discussion of the question whether the provisions of the code considered in the opinion of the court are constitutional. Either proposition being correct, the judgment of the circuit court should be reversed, with directions to enjoin the defendants from picketing the plaintiff's plant.

I am authorized to state that Mr. Justice NELSON concurs in this opinion.

A motion for a rehearing was denied, with $25 costs, on September 15, 1936.