TRUSTEES OF WISCONSIN STATE FEDERATION OF LABOR and others, Respondents, vs. SIMPLEX SHOE MANUFACTURING COMPANY, Appellant.

*June 5—June 26, 1934.*

For the appellant there was a brief by *Lamfrom, Tighe,* *Engelhard & Peck* of Milwaukee, and oral argument by *Leon B. Lamfrom* and *A. J. Engelhard.*

*Joseph A. Padway* of Milwaukee, for the respondents.

NELSON, J.    Numerous assignments of error are asserted by the defendant.   So many of them as need be discussed will be specifically stated.   Suffice it now to say that the errors asserted principally relate to the following questions : (1) Whether the court erred in overruling the demurrer; (2) whether the court had power to issue the temporary injunction; and, if so, (3) whether the court abused its discretion in issuing it.

Much of the confusion which has arisen in this action is due to the fact that the plaintiffs alleged that the attitude and conduct of the defendant was not only in violation of the statutes of this state (sec. 133.07 and ch. 268), but also of the National Industrial Recovery Act and the President's Re-employment Agreement entered into with the defendant. The circuit court held that the complaint stated a cause of action under the President's agreement, and that it had jurisdiction to restrain and prevent violations of that agreement, but due apparently to some doubt as to the effectiveness of our state labor code (ch. 268, Stats.) did not deem it sound to hold that the complaint stated a cause of action thereunder.   The grounding of the decision on the President's agreement has given rise to several questions which are extensively argued in the briefs.

The President's agreement was entered into some time in August, 1933.   The defendant thereby agreed "to co-operate to the fullest extent in having a code of fair competition sub-

mitted by his [its] industry at the earliest possible date and, in any event, before September 1, 1933." The agreement further specifically provided:

"(13) This agreement shall cease upon approval by the President of a code to which the undersigned is subject; or, if the N. R. A. so elects, upon submission of a code to which the undersigned is subject and substitution of any of its provisions for any of the terms of this agreement."

The agreement further provided that it was entered into pursuant to § 4 (a) of the National Industrial Recovery Act [15 USCA, § 704 (a)], and subject to all the terms and conditions required by §§ 7 (a) and 10 (b) of that act [15 USCA, §§ 707 (a), 710 (b)]. On October 3, 1933, a code of fair competition submitted by the boot and shoe manufacturing industry was approved by the President which, by its terms (art. 11), became effective immediately upon the expiration of ten days after its approval. On October 13th the trial court rendered its decision and thereafter, on October 25, 1933, issued the temporary injunction *nunc pro tunc.*

The defendant earnestly contends that the court erred in holding that it had jurisdiction to grant injunctive relief on October 25, 1933, after the code of the boot and shoe manufacturing industry had become effective, because, after the code became effective, no jurisdiction existed in any courts other than those of the United States to prevent or restrain violations of such code, and that since the defendant was clearly subject to the code on October 13th, and thereafter, the court, on October 25th, had no authority to issue the temporary injunction which in substance and effect amounted to preventing or restraining violations of the code. Defendant's contention is based upon § 3 (c) of the National Industrial Recovery Act [15 USCA, § 703 (c)], which provides:

"(c) The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain

violations of any code of fair competition approved under this title; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the attorney-general, to institute proceedings in equity to prevent and restrain such violations."

Identical language is found in the Sherman Anti-Trust Law. 15 USCA, § 4. At least three United States district courts in very recent decisions have held that the courts of the United States have exclusive jurisdiction to prevent or restrain violations of a code adopted pursuant to the National Industrial Recovery Act. *Purvis v. Bazemore,* 5 Fed. Supp. 230; *Stanley v. Peabody Coal Co.* 5 Fed. Supp. 612; *Western Powder Mfg. Co. v. Interstate Coal Co.* 5 Fed. Supp. 619. Those decisions are based upon the construction given to identical language, found in the Sherman Anti-Trust Law, by the United States supreme court in *Minnesota v. Northern Securities Co.* 194 U. S. 48, 24 Sup. Ct. 598; *D. R. Wilder Mfg. Co. v. Corn Products Co.* 236 U. S. 165, 35 Sup. Ct. 398; *General Investment Co. v. Lake Shore & Michigan So. R. Co.* 260 U. S. 261, 43 Sup. Ct. 106; and *Paine Lumber Co. v. Neal,* 244 U. S. 459, 37 Sup. Ct. 718.

Defendant's contention would seem, in the present state of the law, to be sound, but in the view we take of this controversy we find it unnecessary to decide whether a state court has jurisdiction to entertain an action to restrain or prevent a violation of a code adopted by an industry and approved by the President. That question can with finality be decided only by the supreme court of the United States.

Although the complaint specifically alleged that the defendant's conduct was in violation of the laws of this state, the trial court, as before stated, grounded its decision upon the President's agreement. The trial court viewed that agreement as a contract made for the benefit of third parties, that is to say, the employees of the defendant, and on that theory upheld the complaint. *Tweeddale v. Tweeddale,* 116 Wis. 517, 93 N. W. 440, and numerous other cases which

have followed the holding therein. Whether the decision of the trial court is sound need not be considered, nor need we at this time attempt to determine the exact nature of the President's recovery agreement.

We ground our decision, holding that the complaint states a cause of action, upon secs. 133.07 (1) and 268.18, Stats. which provide:

"133.07  *Working people may organize; injunction not to restrain certain acts.*   (1) Working people may organize themselves into or carry on labor unions and other associations or organizations for the purpose of aiding their members to become more skilful and efficient workers, the promotion of their general intelligence, the elevation of their character; the regulation of their wages and their hours and conditions of labor, the protection of their individual rights in the prosecution of their trade or trades, the raising of funds for the benefit of sick, disabled, or unemployed members, or the families of deceased members, or for such other object or objects for which working people may lawfully combine, having in view their mutual protection or benefit.

"268.18  *Public policy as to collective bargaining.*   In the interpretation and application of sections 268.18 to 268.30 the public policy of this state is declared as follows:

"Negotiation of terms and conditions of labor should result from voluntary agreement between employer and employees.   Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control.   In dealing with such employers, the individual unorganized worker is helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment.   Therefore it is necessary that the individual workman have full freedom of association, self-organization, and the designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

No one contends that our state labor code has been superseded by the federal labor code (Norris-La Guardia Act), or that the congress, by the enactment of the federal labor code or the National Industrial Recovery Act, has occupied the particular field covered by those acts to the exclusion of the state, and we perceive no reason for so holding.

The trial court, evidently, was of the opinion that ch. 268, Stats., popularly known as the Wisconsin state labor code, and particularly sec. 268.18, was not sufficiently comprehensive to permit the court to grant the relief demanded; that in so far as it relates to collective bargaining it amounts to a mere declaration of public policy and does not give rise to rights which labor may invoke; and that only by superimposing the National Industrial Recovery Act upon our state code could plaintiffs effectively claim relief. We cannot give to sec. 268.18, Stats., such limited effect. That section deliberately declares the public policy of this state as sec. 2 of ch. 90, 72d Congress Sess. 1, popularly known as the Norris-La Guardia Act [15 USCA, § 702], declares the public policy of the United States. Both enactments are strikingly similar.

Whether the public policy declared in sec. 268.18, Stats., bestows upon laborers any new or additional rights not already given them by the majority, if not substantially all of the courts of this country, need not be specifically considered. In our view, sec. 268.18 is a deliberate declaration by the legislature of the rights which labor shall enjoy in this state. When the legislature declared, "it is necessary that the individual workman have full freedom of association, self-organization, and the designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of col-

lective bargaining or other mutual aid or protection," it intended, in our opinion, that such declaration should have the force of law. To hold otherwise would amount to saying that the legislature did not intend what it said, but merely intended to write into the statutes language pleasing to labor. We can ascribe no such motive or intention to the legislature.

Since, in our opinion, the language of sec. 268.18 must be held to confer, or at least clearly to confirm, rights enjoyed by workmen, there can be no doubt that the complaint states a cause of action thereunder.

Since we hold that the complaint states a cause of action it is unimportant that the circuit court grounded its decision on the President's agreement. On appeal from an order overruling a demurrer based upon the assertion that the complaint does not state a cause of action, the reason which ruled the trial court's decision is unimportant, if the complaint, in fact, does state a cause of action.

The defendant next contends that the court erred in issuing the injunction on October 25th because in the meantime the code had become effective and the President's Reemployment Agreement had ceased to have force and effect, and consequently the action considered as one to prevent or restrain violations of the President's agreement had become moot. Since we hold that the complaint states a cause of action under the laws of this state it follows that the action did not involve moot questions on October 25th. That the findings of the trial court, made pursuant to the provisions of sec. 268.23, are sustained by the evidence adduced at the hearing cannot reasonably be questioned. It appears that on or about August 1, 1933, one C. J. McMorrow, a representative of and organizer for International Boot & Shoe Workers Union, came to Milwaukee for the purpose of organizing workers in the boot and shoe industry. On August 7th he

addressed a letter to the defendant informing its officers of his presence in Milwaukee, stating the nature of his mission, and requesting a personal interview at some later date. On August 21st and on August 24th following, meetings were arranged at the instance of McMorrow which were attended in large numbers by workers employed on different floors of the defendant's manufacturing plant at Milwaukee. At those meetings McMorrow spoke of the desirability of organization, the opportunity presently afforded for self-organization under the terms of the National Industrial Recovery Act, and the possibility of obtaining an increase in wages. At those meetings McMorrow was designated as the representative of the workers assembled, who included many of the employees of the defendant, to conduct on their behalf negotiations with the defendant looking to a wage increase. On August 28th, McMorrow, accompanied by another organizer for the same union, called at defendant's Milwaukee plant and interviewed its vice-president. At this interview McMorrow stated that he was an organizer for his union, the chosen representative of a majority of the workers at defendant's plant, and authorized to negotiate terms and conditions of employment. No question was raised as to McMorrow's being the chosen representative of a large number of defendant's employees. At the conclusion of the interview defendant's vice-president stated that he would take the matter up with defendant's board of directors. On August 29th the workers at defendant's plant were called together by floors, the power being turned off, and personally addressed by the defendant's vice-president, who read a prepared typewritten statement to the different groups. The statement follows:

"Yesterday afternoon Mr. McMorrow and a Mr. Anderson called on me for the purpose of ascertaining our views on the subject of unionizing the Simplex plant and a proposed 20% increase in wage rates. At that time I stated to

both of these gentlemen that I did not want to be quoted at the meeting which I understand will be held tonight for the simple reason that I wanted to tell our employees myself what our views are.

"We have for the past thirteen years been extremely fair and loyal to our workers. The plant was kept running during dull seasons and in order to keep our workers employed we ran stock shoes to the extent that many times our stock and shipping room space was entirely too small to properly handle the situation. We have at all times endeavored to pay averagely higher wages than any other shoe factory in this vicinity and will try to continue to do so. Our plant has always been kept neat and clean so that working conditions have been ideal for our employees. We were one of the first to go on the code and increased our wages approximately 30%. Some shoe factories have not joined the N. R. A. even at this late date. When orders began to fall off we have at all times tried to keep as many people as possible employed by arranging the work or working shorter hours. We did not have to join the N. R. A. for the reason that we have lived up to the principle of it all these years. The President asked our company to co-operate and we did. He has also asked labor to co-operate and we feel that our loyal employees are perfectly happy with our present arrangement and that if a committee of our own employees directly elected by our workers desire to see me, I shall be glad to see them at any time.

"The union officials have advised me that a majority of our people have joined the union. We cannot believe this to be true for the reason that a great many of our workers have intimated to our foremen and other executives that they joined because they thought they had to do so or lose their jobs. Many are of the opinion from the language of the President's code that unions are compulsory. This is not true. You may or you may not join the union, as your conscience dictates. By the same token, the employer may or may not desire to recognize the union or any other outside organization. He also has his choice.

"Milwaukee has always had the reputation of being one of the highest paid and cleanest shoe centers in the United States. We do not believe that the union or any other outside influence will be of any benefit to our employees or to

the Simplex Shoe Manufacturing Company. Our answer to the union officials who called yesterday is, first, as to the recognition of the union, emphatically NO; second, as to the increase of 20% in wage rates, we will increase wage rates just as fast as conditions warrant and always faster than our competitor, but we must always remain competitive if we are all to be employed.

"In the event that we have any interference from the union or any other outside organization, we shall be forced to close our plant indefinitely for the reason that our salesmen will be unable to sell our product on a competitive basis."

Later in the day defendant's vice-president attempted to get into communication by telephone with McMorrow but failed to locate him. That same evening McMorrow learned of the statement made to the company's employees. The following morning when McMorrow called up the vice-president he was told that he, McMorrow, no doubt had already been informed of defendant's decision. McMorrow said that he had been informed; whereupon the company's officer said that in that case there was nothing further for them to discuss, and McMorrow brought the conversation to a close by hanging up the telephone receiver. On September 7, 1933, the following incident occurred at Hartford, Wisconsin, where defendant operates a branch plant. Prior to that date a subordinate of McMorrow had been endeavoring to organize the workers of that plant. He had arranged for a meeting of defendant's workers at a certain public hall in that city. At the time appointed for the meeting defendant's plant superintendent and several foremen stationed themselves outside and near to the doors of the hall in question, with pads and pencils in hand, for the apparent purpose of taking down the names of those employees who might enter the hall. As a result of this gesture none of the workers entered the hall although a considerable number had gathered across the street, presumably for the purpose of attending the meeting.

While much of the language contained in the statement read to the employees of the defendant at the Milwaukee plant is fair and conciliatory, some of it obviously is in the nature of a threat and amounted to an interference with the rights of the defendant's employees freely to associate, self-organize, and designate representatives of their own choosing, and amounted to a rather clear attempt to interfere, restrain, and coerce defendant's employees in the exercise of their rights.

A more serious question is raised as to whether there was evidence from which the court might conclude that the acts complained of would continue, thus making it reasonably necessary to restrain similar conduct in the future. A reading of the record permits the inference that had the defendant understood the true import and meaning of our labor code, and had McMorrow, as the chosen representative of the defendant's employees, grounded the rights asserted upon the labor code of this state, doubtless this controversy would not have arisen. However, from the printed page of the record which obviously cannot give us a clear conception of the precise attitude manifested by the defendant's officers upon the hearing, and whose prior conduct, words, and actions had given rise to this controversy, we cannot say that the court erred in granting the injunctive relief.

The defendant contends that none of the plaintiffs, other than Puza and Koslowski, was a proper party and that the court erred in permitting Puza and Koslowski to be joined as plaintiffs on October 10th. It is quite apparent that the trial court was most desirous of disposing of the action on the merits, and to that end liberally exercised its discretion to allow the bringing in of all interested parties. Whether the court abused its discretion in allowing Puza and Koslowski to come in at that late date against the objection of the defendant and without terms, we need not decide. Since it is our view that this action to restrain the defendant from

interfering with the rights of its employees freely to associate, self-organize, and designate representatives of their own choosing for purposes of collective bargaining, was one in which Local No. 170 was sufficiently interested in the subject of the action and in obtaining the relief demanded (sec. 260.10, Stats.) to be a party, we need not decide whether the other plaintiffs were improperly joined. Excess of parties is not a ground for demurrer in this state.. *Schiffer v. Eau Claire,* 51 Wis. 385, 8 N. W. 253; *State ex rel. Kratche v. Civil Court,* 179 Wis. 270, 272, 191 N. W. 507, and cases cited therein.

Whether the status of a labor union is that of a voluntary unincorporated association or a fraternal society operating under the lodge system is not in our view particularly important. The legislature, by enacting sec. 133.10 and ch. 268 has recognized labor organizations as entities which, under certain circumstances may be sued (sec. 268.21), and they ought, at least by implication, to have the right to sue when their rights are invaded. When it appears that a labor organization and its members are actually engaged in a concerted attempt to procure additional members, to the end that the organization may the more effectively promote its legitimate aims and objects and the interests of its members, and when it appears that the employer of its members and others whom it seeks to procure as members is interfering with their freedom to associate, the rights of such local labor organization are invaded. Numerous cases may be found in the books involving actions against labor organizations where injunctive relief has been sought against them. *Trade Press Publishing Co. v. Milwaukee Typo. Union No. 23,* 180 Wis. 449, 193 N. W. 507; *American Steel Foundries v. Tri-City Central T. Council,* 257 U. S. 184, 42 Sup. Ct. 72. *Texas & N. O. R. Co. v. Railway Clerks,* 281 U. S. 548, 50 Sup. Ct. 427, was an action brought by railway clerks, a voluntary association, to restrain the defendant, its officers

and agents from interfering with, influencing, or coercing its clerical employees in the matter of their organizing and designating representatives for certain purposes under the federal railway labor code of May 20, 1926. No question was raised as to the right of the plaintiff to bring that action. In *United Mine Workers of America v. Coronado Coal Co.* 259 U. S. 344, 42 Sup. Ct. 570, the court, speaking through Chief Justice TAFT said:

"Out of the very necessities of the existing conditions and the utter impossibility of doing justice otherwise, the suable character of such an organization as this has come to be recognized in some jurisdictions, and many suits for and against labor unions are reported in which no question has been raised as to the right to treat them in their closely united action and functions as artificial persons capable of suing and being sued." See citations in the foot-notes appearing on pp. 386 to 389.

We entertain no doubt that a local labor organization may, under our labor code, bring an action to protect its rights or the rights of its members when such rights are invaded.

The defendant next contends that the findings of the court are insufficient to sustain the injunctive relief granted. It is conceded by the parties that this controversy is governed by sec. 268.23, Stats., which requires the findings of certain facts after hearing, preliminary to the granting of either a temporary or a permanent injunction in a labor dispute. The court found:

"(1) That the defendant has interfered with the rights of its employees to join Boot & Shoe Workers Union Local No. 170, and may reasonably be expected to continued to do so unless restrained.

"(2) That the defendant has interfered with the rights of its employees to organize and bargain collectively through their chosen representative, C. J. McMorrow, and may reasonably be expected to continue to do so unless restrained.

"(3) That substantial and irreparable injury to the plaintiffs' rights will follow unless the injunction is issued.

"(4) That the plaintiffs have no adequate remedy at law."

The court did not specifically find that greater injury would be inflicted upon the plaintiffs by the denial of the relief than would be inflicted upon the defendant by the granting thereof. It appears however that that finding was recited in the preamble to the injunctional order. The following language there appears:

"And the court being satisfied that greater injury will be inflicted upon the plaintiffs by denial of the relief prayed for than will be inflicted upon the defendant by the granting thereof."

This, in our opinion, is a sufficient compliance with sec. 268.23 and shows beyond any question of doubt that the court thereby intended to find what it was required by sec. 268.23 (1) (c) to find.

The defendant finally contends that none of the plaintiffs made "every reasonable effort to settle such dispute either by negotiation or with the aid of any available machinery of governmental mediation or voluntary arbitration" (sec. 268.24), and therefore the court had no authority to entertain the action, in the absence of a showing that the party complaining had made every reasonable effort to settle such dispute, etc. In our opinion the contention is without merit. Under sec. 268.18 any interference, restraint, or coercion of individual workmen, as those terms properly should be construed, or with the right of labor freely to associate, self-organize, or designate representatives of their own choosing for the purpose of collective bargaining, is unlawful. The defendant consciously or unconsciously violated sec. 268.18 and thereby committed an unlawful act in violation of said section. In refusing to negotiate with a designated representative of a large number of its employees the defendant violated the declared public policy of this state, and in that regard there was nothing to mediate or arbitrate. An un-

lawful act can hardly be the subject of mediation or arbitration.

Had the defendant refused to negotiate with McMorrow because it questioned the assertion that he was the designated representative of its employees, or large numbers of them, a different question would have arisen. In that case it probably would have been necessary to make every reasonable effort to settle such dispute, either by negotiation or with the aid of any available machinery of governmental mediation or voluntary arbitration, before resorting to court action.

Whatever may have been the law of earlier times, it is clear that the right of workmen to organize, to designate their representatives for purposes of collective bargaining, etc., is clearly recognized not only by the courts but also by specific statutory enactments. *American Steel Foundries v. Tri-City Central T. Council,* 257 U. S. 184, 42 Sup. Ct. 72; *Bayonne Textile Corp. v. American Federation of Silk Workers,* 116 N. J. Eq. 146, 172 Atl. 551. In the case last cited it was said (p. 556) :

"Labor unions, when instituted for mutual help and cooperation, and the attainment of legitimate ends, are lawful. They are a necessary part of the social structure. They are a vital force in our industrial system, and essential for the advancement of the public welfare. The economic independence and security of labor are vital for the public order and welfare. As we have quite recently pointed out, it has long been regarded as a proper function of the state to foster the welfare and safeguard the interests of wage-earners. Economic and other considerations underlie this long-established state policy. The amelioration of the condition of labor is recognized by enlightened government as a duty of paramount importance. And this solicitude for the wage-earners is not alone for the members of the favored class, but for the common good. It is conducive, if not, indeed, essential to the well-being of society that the economic security and contentment of the class that contributes so largely to the furnishing of its material needs be effected and sedulously maintained."

The hope for the future is that capital may deal justly with labor and that labor may deal justly with capital. The vital interests of both are interwoven and interdependent. Both the present and the future welfare of society demand that capital and labor shall deal justly, fairly, and considerately with each other.

*By the Court.*—Both orders are affirmed.