[No. 33399. Department Two. February 16, 1956.]

NORTHGATE MOTORS, INC., *Respondent,* v. AUTOMOBILE DRIVERS AND DEMONSTRATORS UNION, LOCAL 882, *et al., Appellants.*[1]

*Bassett, Geisness & Vance,* for appellants.

*Howe, Davis, Riese & Aiken,* for respondent.

HAMLEY, C. J.—The question for decision is this: Where a labor dispute exists between an employer and a union, and lawful picketing is in progress, may the union, on the showing here made as to common ownership, management, and operation, peacefully picket another company with which the union otherwise has no dispute?

[1] Reported in 293 P. (2d) 762.

The facts are not seriously in dispute. Bellevue Motors, Inc., incorporated in January, 1954, is engaged in the sale of new Mercury cars and used cars at Bellevue, Washington. Automobile Drivers and Demonstrators Union, Local 882, entered into negotiations with the company in an effort to obtain a collective bargaining agreement. When negotiations proved unsuccessful, the company was placed on the unfair list. Picketing began on January 11, 1955. It is conceded that a labor dispute, within the meaning of RCW 49.32.010 (3); Rem. Rev. Stat. (Sup.) § 7612-13 (c), existed between Bellevue Motors and the union, and that the picketing of the Bellevue premises was lawful.

After the picketing began, union representatives noticed that some used cars were being moved from the Bellevue Motors sales lot to the sales lot of Northgate Motors, Inc., nineteen miles away. The latter company, incorporated in April, 1953, is engaged in the sale of used cars, but not of new cars.

On January 31, 1955, the union began picketing Northgate Motors, in addition to Bellevue Motors. The pickets carried signs stating that both companies were "unfair" to the union. Northgate had no employees who were members of the union. The sole purpose of the union in picketing Northgate was to establish contractual relations with Bellevue Motors.

Northgate Motors then commenced this action to enjoin the picketing of its place of business. An injunction was granted, and defendants appeal.

Appellants contend that there is such a relationship between Bellevue Motors and Northgate Motors that the union was entitled to peacefully picket the latter in connection with its labor dispute with the former.

The facts concerning such relationship are as follows: The two companies were separate Washington corporations, with identical officers, directors, and stockholders. The companies had separate bank accounts, but there was often deposited in one account or the other the proceeds of sales made by the other company. The chief bookkeeping for Northgate was handled at Bellevue. The Bellevue book-

keeper also did the clerical work of issuing checks for both places of business.

Bellevue Motors, but not Northgate Motors, held a franchise from the Ford Motor Company to sell new Mercury automobiles. This franchise required Bellevue to make periodic reports showing the sale of used cars as related to the sale of new cars. In making these reports, Bellevue customarily showed all used cars sold at both places of business.

The companies advertised separately, but both sold the same stock of used cars. About every ten days, salesmen were given an up-to-date list of the entire stock of used cars at both Bellevue and Northgate and of new cars at Bellevue. Salesmen of both companies were permitted to, and did, sell cars being displayed on either lot. Used cars— sometimes several in one day—were transferred from one lot to the other by employees of one company or the other.

Specific instances were established in which used cars which were the property of Bellevue Motors were sold from the Northgate lot. A common practice was for Bellevue Motors to buy a used car, finance the purchase, acquire title, and then deliver it to Northgate for sale. After the sale, Bellevue Motors would sign the dealer's report of sale.

A mechanic employed by Bellevue Motors did a substantial part of his work on the Northgate premises and for Northgate's benefit. One salesman, who was employed by Bellevue Motors from June to September, 1954, testified that Bellevue paid his commission on every sale, wherever made. He further testified that he was informed that the two places of business were "one and the same," as far as sales were concerned. Another salesman, who was employed by Bellevue Motors for about two months prior to the commencement of picketing, testified to the same effect. This witness stated that he was never told which company owned the cars, but Bellevue Motors paid the commission on all of his sales.

The method of doing business, as described above, existed before the picketing at Bellevue began, and continued without substantial modification after the Bellevue dispute arose.

There is nothing to indicate that the close operating relationship between the two companies was devised or in any way changed for the particular purpose of impairing the effectiveness of picketing at Bellevue.

The trial court determined that there were equitable grounds warranting issuance of the injunction, and that issuance thereof was not precluded by the labor dispute act (RCW 49.32.010 *et seq.* [*cf.* Rem. Rev. Stat. (Sup.), §§ 7612-1 *et seq.*]), enacted in 1933 (Laws of 1933, Ex. Ses., chapter 7, p. 10). In so deciding, the trial court concluded that there was no "labor dispute" between Northgate Motors and the union, as the quoted term is defined in § 13 of the act (RCW 49.32.010; Rem. Rev. Stat. (Sup.), § 7612-13), and that the act was therefore inapplicable.

We are not in agreement with this conclusion. The exact coincidence of ownership and management of the two companies, the free interchange of used car stocks, the freedom given employees to sell from either premises, the control exercised by Bellevue Motors concerning the accounts, checks, commissions, and acquisition of used cars, are undisputed. The two companies were virtually operated as one business. While this was not done with the design to impair the effectiveness of the strike, it unquestionably had that result.

Thus, while Northgate and Bellevue are separate corporations, the way in which the two companies, for all practical purposes, operate as one cannot be overlooked. It follows that Bellevue's labor dispute must be regarded as Northgate's.

This is not the first time we have looked through form to substance in determining the true practical relationship between persons involved in a labor dispute. In *Berger v. Sailors Union of the Pacific,* 29 Wn. (2d) 810, 189 P. (2d) 473, we looked through a purported "partnership" arrangement to see the actual relationship of employer and employee. In *Wright v. Teamsters' Union Local No. 690,* 33 Wn. (2d) 905, 207 P. (2d) 662, we dealt with the owner of a food market as if he were an employer of the operator of the

meat department, although it was recognized that he was not an employer "in every sense of the word."

Respondent concedes that the union may lawfully picket Bellevue Motors. We hold that it may also, under the circumstances here shown, peacefully picket the allied employer, Northgate Motors.

Reversed.

DONWORTH, HILL, WEAVER, and ROSELLINI, JJ., concur.