[No. 42691. En Banc. March 7, 1974.]

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL No. 286, AFL-CIO *et al., Appellants,* v. SAND POINT COUNTRY CLUB *et al., Respondents.*

*John E. Rinehart, Jr.* (of *Donaldson, Hafer, Cassidy & Price*), for appellants.

*John D. Blankenship* (of *Montgomery, Purdue, Blankenship & Austin*), *William F. Lenihan* (of *Lenihan, Ivers, Jensen & McAteer*), *Thomas F. McGrath, Jr.* (of *Torbenson, Thatcher & McGrath*), and *David E. Gannett* and *Jerry W. Spoonemore* for respondents.

ROSELLINI, J.—Alleging that a majority of the golf course maintenance men employed by the respondents had authorized them to represent the employees in collective bargaining with their employers, and further alleging that the respondents had failed and refused to bargain with them, the appellants brought this action seeking an injunction

requiring the respondents to engage in such bargaining. The respondents' motion for summary judgment was granted.

A single contention is made on appeal—that RCW 49.32.020 imposes upon employers an affirmative duty to bargain with representatives of their employees. It is not suggested that such a duty exists under any constitutional mandate or by virtue of any principle of common law. It appears to be undisputed that the National Labor Relations Board has declined jurisdiction over enterprises such as the golf clubs which the respondents operate.

RCW 49.32, commonly referred to as Washington's little Norris-LaGuardia act, makes "yellow-dog" contracts unenforceable (RCW 49.32.030). It also places limitations upon the injunctive powers of the courts in dealing with labor disputes.[1] RCW 49.32.011, .030, .060, .072 and .074. It also provides for accelerated appellate review in injunction actions arising out of labor disputes (RCW 49.32.080) and procedural safeguards for persons charged with contempt of court in cases arising under the chapter (RCW 49.32.090-.100).

The term "collective bargaining" is used only once in the act. It appears in the policy declaration, or "preamble," in the following context:

In the interpretation of this chapter and in determining the jurisdiction and authority of the courts of the

[1]*See Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 63 P.2d 397 (1936), holding RCW 49.32.072, .073 and .074 (then Rem. Rev. Stat. (Supp.) § 7612-7, 8 and 9) unconstitutional as an encroachment upon the judicial power of the courts. *See also Gazzam v. Building Serv. Employees Local 262*, 29 Wn.2d 488, 188 P.2d 97, 11 A.L.R.2d 1330 (1947); *Hanke v. Teamsters Local 309*, 33 Wn.2d 646, 207 P.2d 206 (1949); *Ostroff v. Laundry Drivers' Local 566*, 37 Wn.2d 595, 225 P.2d 419 (1950); *Union Elec. & Plumbing Supply, Inc. v. Plumbing & Pipe Fitters Local 32*, 45 Wn.2d 17, 272 P.2d 144 (1954), and *Audubon Homes, Inc. v. Spokane Bldg. & Constr. Trades Council*, 49 Wn.2d 145, 298 P.2d 1112 (1956), approving injunctions where picketing was found to be coercive. In *Yakima v. Gorham*, 200 Wash. 564, 94 P.2d 180 (1939), this court held unconstitutional a municipal ordinance prohibiting peaceful picketing, which was in conflict with the public policy of the state announced in RCW 49.32.

state of Washington, as such jurisdiction and authority are herein defined and limited, the public policy of the state of Washington is hereby declared as follows:

WHEREAS, Under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, *it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protections;* therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the state of Washington are hereby enacted.

(Italics ours.) RCW 49.32.020.

The appellants do not complain of interference with the right to organize, or to designate representatives of the employees' own choosing to negotiate the terms and conditions of their employment. Rather, they claim that the respondents are in violation of a duty to engage in collective bargaining, which duty, they say, is imposed upon them in the policy declaration in the statute. In short, they claim a statutory right, not merely to be designated the representatives of the employees for purpose of negotiation, but to have the aid of the courts to compel the employer to negotiate. Fatal to their contention is their inability to point to language in the act which creates such a right.

The rights which are recognized in the policy statement are rights of organization, of concerted activity "for the purpose of collective bargaining or other mutual aid or protections." But the appellants would read this language as imposing a positive duty upon employers to negotiate with

the employees' representative, once that representative has been chosen. Recognizing that the duty is not expressly imposed, they insist nevertheless that it is implied. If there is not such a duty, they say, the right to organize and to select a representative is useless.

Such a theory discounts the entire history and experience of the labor movement. It was because the laboring man had learned that there is strength in unity that he fought so hard for the right to organize, to picket, and to strike. The legislature, in enacting this measure, apparently considered that the economic pressure which organized labor could exert upon employers was all that was necessary to bring the employer to the bargaining table.

The act recognizes the validity of those tools of economic pressure, the strike and the peaceful picket line. This court also has recognized the legitimacy of those methods of achieving collective bargaining. *Associated Gen. Contractors, Inc. v. Trout,* 59 Wn.2d 90, 366 P.2d 16 (1961); *Northgate Motors, Inc. v. Automobile Drivers Local 882,* 48 Wn.2d 356, 293 P.2d 762 (1956). *And see* cases cited in note 1 *supra.* The appellants do not claim that these methods are foreclosed to the respondents' employees, nor do they claim that they would be ineffective.

In a 6-3 decision, this court held in *Krystad v. Lau,* 65 Wn.2d 827, 400 P.2d 72 (1965),[2] that when the declaration of policy was read in context with RCW 49.32.030 (making "yellow-dog" contracts unenforceable) and with the entire act, it manifested a legislative intent that employers should not be permitted to interfere with the exercise of the rights recognized in RCW 49.32.020 by discharging employees who engaged in union activities. It is upon this case that the appellants place their sole reliance.

As was made clear in *Krystad v. Lau, supra,* we had there to determine whether the courts were powerless to provide a remedy where rights expressly recognized and protected by the legislature were threatened with curtail-

---

[2]This case has been criticized. *See* C. Peck, *Judicial Creativity and State Labor Law,* 40 Wash. L. Rev. 743 (1965).

ment or extinction. It was apparent that if employers were free to discharge employees for their union activities, the right to engage in such activities would be rendered meaningless. The operative provision of the act, making unenforceable contracts between employers and employees which were designed to discourage union membership, we found, manifested a legislative intent that employers should not discharge employees for such membership.

In the case before us, it is not contended that the respondents have interfered in any manner with the union activities of their employees or that they have threatened to discharge any employees who may join the appellant organization or any other labor union.

█ Reading RCW 49.32 in its entirety, we are convinced that its purpose was to facilitate the achievement by employees of an effective bargaining position and that it was not its purpose to provide for compulsory collective bargaining.

Where the legislature has seen fit to impose upon employers an affirmative duty to bargain with their employees, it has done so by express statutory provision. While other states have enacted comprehensive labor-management relations acts (*see Krystad v. Lau, supra,* n.1, at 831), the legislature of this state has seen fit to regulate such relations only in the case of public employees and health service employees. In 1967, after this court had handed down its decision in *Port of Seattle v. ILWU,* 52 Wn.2d 317, 324 P.2d 1099 (1958), holding that public employees may not strike if the public health and safety are involved, the legislature enacted RCW 41.56, governing public employees' collective bargaining, and imposing upon the employer, in RCW 41.56.100, a duty of engaging in such bargaining. At the same time it expressly refrained from granting the right to strike. RCW 41.56.120. *See Roza Irrigation Dist. v. State,* 80 Wn.2d 633, 497 P.2d 166 (1972).

In 1972, the legislature passed an act which governs labor relations of health care employees and makes it an unfair labor practice to refuse to bargain in good faith "with the

duly designated representatives of an appropriate bargaining unit of employees" (RCW 49.66.040). This act places heavy restrictions upon the right to strike and to picket (RCW 49.66.060).

Thus it appears that where the legislature has seen fit to impose upon an employer a duty to bargain with the designated representative of his employees, it has at the same time either restricted the right to strike and to picket or has recognized that the right to strike is not available to employees covered by the act. In other words, the imposition of the duty upon the employer has been compensatory. The policy statements of both acts (RCW 41.56.010 and 49.66.010) manifest a legislative awareness that the provisions of the act which are designed to facilitate or implement collective bargaining, are innovative. Neither act purports to amend RCW 49.32.020, as it would have been appropriate to do if the legislature had regarded that act as one providing for compulsory collective bargaining.

In urging the court not to read a new provision into the policy statement contained in RCW 49.32.020, the respondents have drawn to its attention the immense complexity of problems of labor-management relations and the inadequacy of court structure and facilities to administer the law in this field without statutory guides or regulatory agencies.[3] Professor Cornelius J. Peck also notes the hazards attendant upon judicial legislation in this area (note 2 *supra*). If the statute was open to the construction contended for by the appellants, these considerations might well be significant in persuading the court that such a meaning was not intended. We need not weigh them, how-

---

[3]One of the first questions which would have to be resolved would be: Upon what matters is the employer required to negotiate? The United States Supreme Court interprets the National Labor Relations Act (29 U.S.C. § 158(d)) rather strictly insofar as it imposes a duty to bargain with union representatives, holding that the duty exists only with respect to those matters designated in the statute. *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 2 L. Ed. 2d 823, 78 S. Ct. 718 (1958). The Ninth Circuit Court of Appeals has so held in *Seattle First Nat'l Bank v. NLRB*, 444 F.2d 30 (9th Cir. 1971).

ever, since we find that neither expressly nor impliedly has the legislature introduced into this statute a provision imposing upon employers a duty to bargain with labor representatives.

A further point should be mentioned. In reaching its decision in *Krystad v. Lau, supra,* this court cited *Texas & New Orleans R.R. v. Brotherhood of Ry. & S.S. Clerks,* 281 U.S. 548, 74 L. Ed. 1034, 50 S. Ct. 427 (1930). In that case, the Railway Labor Act under consideration had provided that representatives of the employees and employers should be designated by collective action "without interference from the other party." However, the statute provided no procedure for enforcing the provision forbidding interference. The United States Supreme Court held that it had the power to supply the remedy where the legal right had been created by "language suitable to that end." In *Krystad v. Lau, supra* at 840, we quoted with approval the following statement of the Supreme Court:

> ". . . While an affirmative declaration of duty contained in a legislative enactment may be of imperfect obligation because not enforceable in terms, a definite statutory prohibition of conduct which would thwart the declared purpose of the legislation cannot be disregarded. . . ."

In that case, there was found in the act an implied prohibition of conduct which interfered with the rights recognized by the legislature. In *Krystad v. Lau, supra,* the right recognized and protected was of the same nature, although the legislature had not expressly decreed that it should be exercised "without interference." Here, the alleged duty is an affirmative duty and, therefore, assuming the duty were found to exist, it would be open to the objection that it was of "imperfect obligation" because there is no provision for its enforcement.

Another related objection which can be launched against the finding of such an implied affirmative obligation is that the duty allegedly imposed is not described with sufficient definiteness to enable an employer to know when, with

whom, and under what conditions and for what purposes he is required to negotiate. In *State v. Reader's Digest Ass'n, Inc.*, 81 Wn.2d 259, 273, 501 P.2d 290 (1972), commenting upon the concept of statutory vagueness as a denial of due process, we quoted the following from *Connally v. General Constr. Co.*, 269 U.S. 385, 70 L. Ed. 322, 46 S. Ct. 126 (1926):

> [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.

*And see Bradshaw v. Seattle*, 43 Wn.2d 766, 264 P.2d 265, 42 A.L.R.2d 800 (1953), holding RCW 47.36.060 too indefinite to impose upon municipalities an affirmative duty to install traffic signs at intersections.

 Another aspect of the problem which deserves notice is that the language relied upon is contained in the policy statement. We have generally adhered to the principle that such statements are not intended to and do not in fact create legal obligations. *Whatcom County v. Langlie*, 40 Wn.2d 855, 246 P.2d 836 (1952); *State ex rel. Berry v. Superior Court*, 92 Wash. 16, 159 P. 92 (1916). *And see In re Bale*, 63 Wn.2d 83, 385 P.2d 545 (1963) and *Huntworth v. Tanner*, 87 Wash. 670, 152 P. 523 (1915). In *State ex rel. Berry v. Superior Court, supra,* this court said at page 32:

> Both in England and in this country it was at one time a common practice to prefix to each law a preface or preamble stating the motives and inducement to the making of it; but it is not an essential part of the statute and is now generally omitted. It is not only not essential and generally omitted, but it is without force in a legislative sense, being but a guide to the intentions of the framer. As such guide it is often of importance. In this sense it is said to be a key to open the understanding of a statute. The preamble is properly referred to when doubts or ambiguities arise upon the words of the enacting part. It can never enlarge. It is no part of the law. Sedgwick, Construction of Statutory & Constitutional Law (2d ed.), pp. 42, 43; 1 Story, Constitution (5th ed.),

book 3, ch. 6; *Edwards v. Pope,* 3 Scam. (Ill.) 465; Bouvier's Law Dictionary.

It is true that in *Krystad v. Lau,* 65 Wn.2d 827, 400 P.2d 72 (1965), we gave some substantive effect to the policy statement relied upon in this action. We did so because a reading of the act as a whole, and particularly the provision relating to "yellow-dog" contracts, convinced us that it was the legislative intent to secure for employees the right to engage in union activities and it was manifest that if a remedy was not provided to prevent employer interference with that right, the legislative purpose would be thwarted. It was not our intent in that case to lay down a new rule respecting the import of policy statements contained in legislation.

If the statute were open to the construction placed upon it by the appellants, all of these considerations would be of force in persuading the court that it was not the legislative purpose to provide for compulsory collective bargaining when it enacted RCW 49.32. We need not weigh them, however, since we find that neither expressly nor impliedly has the legislature introduced into this statute a provision imposing upon employers a duty to bargain with labor representatives.

Courts in other jurisdictions which have been asked to find in statutes of this kind an affirmative duty to engage in collective bargaining have consistently refused to do so. The leading case is *Petri Cleaners, Inc. v. Automotive Employees Local 88,* 53 Cal. 2d 455, 349 P.2d 76, 2 Cal. Rptr. 470 (1960). That case was reaffirmed in *Messner v. Journeymen Barbers Local 256,* 53 Cal. 2d 873, 351 P.2d 347, 4 Cal. Rptr. 179 (1960), and was followed by *Building Serv. Local 47 v. St. Luke's Hosp.,* 11 Ohio Misc. 218, 227 N.E.2d 265 (1967), and *Peters v. Poor Sisters of St. Francis Seraph, Inc.,* 267 N.E.2d 558 (Ind. App. 1971). The appellants have cited no case in which a court has found in such a statute the meaning for which they contend.

There being no affirmative duty on the part of the re-

spondents to engage in collective bargaining, the trial court properly dismissed the action.

The judgment is affirmed.

FINLEY, HUNTER, HAMILTON, STAFFORD, WRIGHT, UTTER, and BRACHTENBACH, JJ., concur.

HALE, C.J. (dissenting)—Plaintiffs seek the intervention of a court of equity to compel their employer both to recognize their union and to participate in collective bargaining negotiations. They claim this right by virtue of RCW 49.32.020, the little Norris-LaGuardia act, as interpreted by this court in *Krystad v. Lau,* 65 Wn.2d 827, 400 P.2d 72 (1965).

Under the common law of England and in the absence of statute, contract, binding custom or tradition, an employer ordinarily has the right to hire and fire at will, and an employee has a corresponding right to refuse or quit work at any time. This once inexorable English common-law principle apparently accepted the premise that a free and untrammeled labor market exists to which both employer and employee have access with the employer under no common-law duty to hire and the employee under no common-law duty to work. *Mechanics' Foundry & Mach. Co. v. Lynch,* 236 Mass. 504, 128 N.E. 877, 12 A.L.R. 1057 (1920); *People v. Chicago, M. & St. P. Ry.,* 306 Ill. 486, 138 N.E. 155, 28 A.L.R. 610 (1923). The American common law, however, questioned the existence of a free labor market and recognized the inherent inequities of these English rules long before the advent of labor relations statutes of any kind and, consequently, abandoned the premise in order to adopt a rule that labor unions would no longer be considered unlawful criminal conspiracies. The workman's right to work was thus declared to be a property right (*Adair v. United States,* 208 U.S. 161, 52 L. Ed. 436, 28 S. Ct. 277 (1908)), and one which cannot be abridged by legislation denying it the status of property. *Bogni v. Perotti,* 224 Mass. 152, 112 N.E. 853 (1916). With the right to labor and to contract for labor regarded as a property right

under the American common law, it followed that combinations and agreements to negotiate for wages, hours, and conditions could not be judicially regarded as conspiracies or illegal combinations but rather must be regarded as lawful devices to protect and preserve one's property rights. *Commonwealth v. Hunt,* 45 Mass. (4 Metcalf) 111, 38 Am. Dec. 346 (1842). This was the state of the law with respect to employer-employee relationships in this state when the legislature enacted Laws of 1933, 1st Ex. Sess., ch. 7, p. 10 (RCW 49.32), also known as the little Norris-LaGuardia act. *See Krystad v. Lau, supra,* for a restatement of the right of the employer to hire and fire at will and the right of the workman to work or quit work at will, but with the added right in the workman to join or organize a union to speak and negotiate for him without the risk of being held to membership in a criminal conspiracy.

Plaintiffs now stand upon the decision of this court in *Krystad v. Lau, supra,* and our statement at page 846, that:

> [W]e therefore conclude that Laws of 1933, Ex. Ses., chapter 7, § 2, p. 10 (RCW 49.32.020), the little Norris-LaGuardia Act, in expressly declaring the public policy of this state, conferred actionable rights on employees, among which rights were that they be free from coercion, interference and restraint from and by their employers in organizing or joining a labor union and in designating such union as their agent for collective bargaining.

That decision, plaintiffs contend, constitutes a ruling by this court that the little Norris-LaGuardia act was designed to accomplish more than merely the outlawing of yellow-dog contracts, or curbing the court's powers to issue injunctions in labor disputes; they contend that it actually declares in the workman a right to organize labor unions and the right to carry on active negotiations with an employer who, but for the statute, might be unwilling to negotiate at all.

That the instant case involves a bona fide labor dispute under the National Labor Relations Act (29 U.S.C. § 151, *et seq.,* 49 Stat. 449), the state's little Norris-LaGuardia act

(RCW 49.32), and the American common law, and *Krystad v. Lau, supra,* is undoubted. A majority of defendant golf courses' maintenance employees designated plaintiff union as their agent for collective bargaining concerning wages, hours and other conditions of their employment. When the union representative sought to negotiate with defendant employers, the latter categorically declined to do so claiming that they were under no legal duty to engage in any form of negotiations or collective bargaining whatever. The learned trial court, finding no such duty in law on the employer's part and ruling in effect that the *Krystad v. Lau* opinion went no farther than to hold that the little Norris-LaGuardia act did no more than curtail the court's power to issue injunctions and outlaw yellow-dog contracts, sustained the employers' position. *See* Peck, *Judicial Creativity and State Labor Law,* 40 Wash. L. Rev. 743 (1965), a treatise relied on extensively by the trial court and this court in the instant case. The total operation of the little Norris-LaGuardia act, it is now said, even when liberally construed does not go beyond that assertedly plain meaning of the statute, and to now order collective bargaining in applying the act, it is contended, amounts to judicial legislation.

One readily shares the court's qualms about judicial legislation and agrees that legislating should be left to the legislative branch and judging kept within the judiciary. These two fundamental ideas are ineluctably enshrined in the constitutions, which, throughout their structures, have separated the powers of government. It is right that courts aim to keep these powers separate. Nor should the courts legislate in the guise of interpreting, construing and applying the statutes any more than they should rewrite private contracts under the same guise. But at that point, I would part from the majority. Plaintiff labor union here, as I see it, is not asking the court to legislate but to simply exert its equity powers in giving effect to a statute so as to afford them their actionable statutory rights to "be free from interference, restraint, or coercion" from and by their em-

ployers in organizing or joining a labor union *and in designating such union as their agent for collective bargaining.* RCW 49.32.020.

The learned trial judge, in sustaining the contentions of defendant golf courses, assumed two basic premises which I think to be wrong, and the error is now compounded on review. First, it was and now is assumed that *Krystad v. Lau, supra,* is unsound and represented an abuse of the judicial power, a usurpation of the legislature, by constituting legislative rather than judicial action. *See* Professor Peck's law review article adopted in principle by the trial court. Secondly, it was and now is assumed that to decree collective bargaining in the instant case would be an extension of that legislative action of this court in further abuse of its powers because of the necessity of judicially creating and operating administrative machinery to determine whether the bargaining is in good faith and enforcing the decree if violated.

Both of these assumptions I find untenable. That a court of equity must fashion a means of enforcing its lawful decrees does not require it to legislate. In *Krystad v. Lau, supra,* this court did not, I think, legislate into existence a state labor relations act but simply concluded that the legislature had enacted an extremely limited one in the little Norris-LaGuardia act (RCW 49.32). We held in that case that the sweeping, categorical language of RCW 49.32.020, which, while superficially appearing to constitute a declaration of public policy, actually constituted an operative section and did confer affirmative and enforceable statutory rights upon employees and their unions; that the very language of the section amounted to a legislative enactment granting employees and their unions rights "to obtain acceptable terms and conditions of employment." RCW 49.32.020. The statute, we said, allowed employees to negotiate the terms and conditions of their employment under conditions of full freedom of association, self-organization and designation of representatives of their own choosing. This court gave operative effect to the provision that em-

ployees "shall be free from interference, restraint, or coercion of employers of labor, or their agents . . . in other concerted activities for the purpose of collective bargaining or other mutual aid or protections . . ." RCW 49.32.020. Our *Krystad v. Lau* opinion was based in part on *Trustees of Wis. State Fed'n of Labor v. Simplex Shoe Mfg. Co.*, 215 Wis. 623, 256 N.W. 56 (1934), which we cited with approval for the proposition that the public policy declaration of the little Norris-LaGuardia act adopted by that state did confer affirmative and forcible statutory rights upon the employees, and that the function of that portion of the statute was not merely an interpretative aid.

The question arising in the present case thus is not whether statutory rights were conferred in RCW 49.32.020 but whether corresponding duties were imposed by it upon employers. I would, therefore, assume that, when the legislature categorically granted to working people freedom from coercion, interference and restraint from their employers in organizing and joining a labor union, and freedom to designate such union as their agent for collective bargaining, the legislature intended to impose a correlative duty upon the employers to engage in collective bargaining with their employees or their union.

The duty to negotiate in good faith with respect to wages, hours and conditions of employment is a responsibility that may, I think, be enforced by a court of equity upon both employers and employees. In *Johnson v. Christ Hosp.*, 84 N.J. Super. 541, 202 A.2d 874 (1964), members of a union sought reinstatement and damages for their claimed wrongful discharge based on their membership in and activities on behalf of their labor union. A decree ordering collective bargaining and upholding the court's jurisdiction was sustained on review, even though there was not in existence a state or federal statute providing for mandatory collective bargaining. The court in that case said:

It is equally well settled that neither the absence of labor legislation in this State, nor the disinclination of

the Legislature to provide machinery or legislation for the control of intrastate labor matters can bar this court from the authority, as part of its general jurisdiction, to speak in actions dealing with these matters. *Cooper v. Nutley Sun Printing Co., Inc., supra,* at *p.* 195 [36 N.J. 189, 175 A.2d 639]; *Independent Dairy Workers, etc. v. Milk Drivers, &c., Local No. 680,* 30 *N.J.* 173, 181 [152 A.2d 331] (1959).

Although, unlike the Washington State Constitution, article 1, section 19 of the New Jersey Constitution contained a declaration of rights to bargain collectively, that constitution, it should be noted, did not expressly impose upon employers a corresponding duty to engage in collective bargaining. Holding, in *Johnson* at page 555, that to construe the constitutional provision so as "to impose no affirmative duty upon an employer to bargain collectively with the representative of his employees renders impotent the rights guaranteed to employees under the constitutional provision," the New Jersey court, as I would here, found an affirmative duty to bargain collectively with a duly designated representative of the majority employees' labor union.

In another case, not directly but inferentially in point, it was held that, although a state mediation act did not specifically impose a duty upon an employer to mediate or otherwise bargain collectively with his employees where it was clear that the statute had been enacted to give employees the rights of self-organization and to choose their representatives for collective bargaining with their employer, one of the main objectives was to avoid strikes and other forms of industrial strife " 'and to that end it was recognizing the principle of collective bargaining and the right to organize for that purpose.' " *See General Teamsters, Local 406 v. Uptown Cleaners & Hatters, Inc.,* 356 Mich. 204, 223, 97 N.W.2d 593 (1959).

In that case, the Michigan Supreme Court's decision, I think, is based largely on the rationale that the statutory rights to form a union and choose representatives implies necessarily a corresponding right to collective bargaining,

and places a correlative duty upon the employer to participate in good faith in it.

If we apply the same rationale to the instant case, the results should be the same. We have in existence the little Norris-LaGuardia act, a statute explicitly creating a right to organize a union free from coercive influences of employers both in its formation and in its right to choose representatives and to bargain collectively. That statute, in commonsense, must be construed to impose corresponding or correlative duties upon employers. The right cannot be said to exist without a corresponding duty. That the statute does not implement these rights and duties by establishing administrative machinery to apply and enforce these rights and duties does not ipso facto repudiate their existence but simply makes it more awkward and puts a greater burden on the courts to sustain them.

Nor can it be held that, because the court cannot compel the achievement of an agreement or dictate its terms, the rights and duties to bargain collectively do not exist. Even in those areas of public service and employment where statutes expressly grant a right in the employees to collective bargaining and place a corresponding duty on the representatives of the employing agency presumably to negotiate, the statute is not deemed a mandate that agreement be reached. What the statute is held to prescribe, however, is that the parties do negotiate in good faith. *See Spokane Educ. Ass'n v. Barnes,* 83 Wn.2d 366, 517 P.2d 1362 (1974).

The entire panorama of labor law, affecting labor-management relationships in private industry and business, largely recognizes that, in the absence of a legitimate state interest warranting a power in the state to deny the right to strike and to compel collective bargaining agreements, there may, nevertheless, exist a right and duty to compel the process of collective bargaining. While this may seemingly engender an exercise in futility, *i.e.,* a decree directing that the negotiations take place in good faith but without authority to order the achievement of an ultimate contract, experience has shown, I think, that, even under such

514

circumstances, collective bargaining is not always futile and is frequently successful. As the saying goes, one can lead a horse to water but cannot make it drink; but it is better to lead it as far as it will peaceably go than not to make the effort. Thus, the statute (RCW 49.32.020) should be interpreted to mean that, while the courts cannot mandate the achievement of a final agreement nor dictate its terms, they can, however, under their equity powers, apply the statute by ordering at least that the parties bargain collectively in good faith, for a reasonable time, and until it is reasonably clear that further negotiations must necessarily be futile. That is all that plaintiffs ask for here and that, I think, they are entitled to receive under RCW 49.32.020.